**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**Filed 1/24/97**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

DARRELL JAY GLOVER,

        Defendant-Appellant.

No. 95-4096

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

SUSAN NOREEN KOZAK,

        Defendant-Appellant.

No.95-4101

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D. Ct. No. 94-CR-16)**

Jerold D. McPhee, Salt Lake City, Utah, appearing for the Defendant-Appellant in No. 95-4096.

Deirdre A. Gorman, Farr, Kaufman, Sullivan, Gorman, Jensen, Medsker & Perkins, Ogden, Utah, appearing for the Defendant-Appellant in No. 95-4101.

Richard D. McKelvie, Assistant United States Attorney, (Scott M. Matheson, Jr., United States Attorney, with him on the brief) Salt Lake City, Utah, appearing for the Plaintiff-Appellee in Nos. 95-4096 and 95-4101.

Before **ANDERSON**, **BARRETT,** and **MURPHY**, Circuit Judges.

**MURPHY**, Circuit Judge.

Defendants Susan Kozak and Darell Glover entered conditional guilty pleas to possession of methamphetamine with intent to distribute, a violation of 21 U.S.C. § 841(a)(1). They bring these appeals claiming that the district court erred when it refused to grant their pretrial motions to suppress. Kozak claims that the district court erred when it refused to suppress drugs discovered during a search of an Express Mail package and statements she made during an interview with postal inspectors. Glover asserts that the district court erred when it refused to suppress statements he made during a custodial interrogation as well as a hand-written confession. Both assert that the district court should have suppressed evidence discovered during a search of the home that they share. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

# I. BACKGROUND

In late 1993, Postal Inspector Gary Collins received a telephone call from the Postmaster at Willard, Utah. The Postmaster was concerned about a suspicious Express Mail package emitting the odor of coffee addressed to Kozak's post office box. Collins contacted James Summerhill, a detective with the Box Elder County Sheriff's Office, to discuss the package and to arrange for a drug-detecting dog to sniff the package. Summerhill indicated Kozak was currently a police officer who had worked on drug assignments and was, therefore, familiar with the methods used to mask the smell of drugs.

Summerhill in turn contacted the Willard Postmaster to arrange for a drug-detecting dog to check the package. The Postmaster indicated Kozak had recently received a number of suspicious packages. Because the dog was unable to detect the presence of drugs, the package was returned to the mail stream. Nevertheless, Collins and Summerhill continued to monitor the frequency and nature of all Express Mail packages delivered to Kozak.

In January, 1994, several postal inspectors approached their supervisor, Joseph Schouten, and informed him that suspicious Express Mail packages were being delivered to Kozak's post office box. The suspicious circumstances surrounding the shipment and receipt of the packages, along with some information regarding the possibility Kozak's daughter might be involved in drug

trafficking, led the postal inspectors to suspect the packages contained controlled substances. As a result of these suspicions, the postal inspectors instituted a mail watch[1] for Express Mail packages going to Kozak's post office box or street address.

On April 12, 1994, another Express Mail package arrived in Salt Lake City. Postal inspectors detained the package for approximately one day while they sought a search warrant. Schouten prepared a lengthy affidavit recounting the investigation of Kozak and requesting a search warrant to open the package. The affidavit, along with a warrant, was presented to a United States Magistrate on April 13, 1994. The magistrate issued the warrant; postal inspectors executed it immediately. The package contained two white envelopes; each envelope contained coffee grounds and methamphetamine. After taking samples of the methamphetamine, Schouten resealed the Express Mail package so that postal inspectors could make a controlled delivery.

The controlled delivery took place on April 14, 1994. On that morning, the Willard Postmaster informed Kozak that the package was at the post office.

_____

[1]According to Collins, a mail watch entails asking the post office to specifically watch for a particular address and, if anything comes in for that address, to pull it out of the mail stream and notify the postal inspectors. The postal inspectors then decide whether to pursue anything further or simply return it to the mail stream.

Glover appeared at the post office and picked up the package. As he was leaving the parking lot, he was stopped by the postal inspectors and placed under arrest.

Glover was arrested for possession of a controlled substance and advised of his *Miranda* rights. Schouten asked Glover if he wanted to make a statement concerning the incident. Glover indicated he understood his rights and that he did not wish to talk at that time. The officers immediately ceased questioning Glover.

After Glover's arrest, Summerhill and Schouten went to Kozak's home. They arrived at approximately 7:00 a.m., knocked on the door, and were greeted by Kozak. Schouten identified himself as a postal inspector, informed Kozak that Glover was in custody, and indicated that, although she was not under arrest, they would like to talk to her at the station. Kozak agreed to accompany the officers to the station. Schouten, Summerhill, and Kozak then went directly to Summerhill's office. Schouten again advised Kozak that she was not under arrest but indicated that he would like to talk to her about the events of the past several months. In the course of the resulting conversation, Kozak admitted that she knew the package contained methamphetamine and that she had received similar packages in the past. She asserted, however, that the drugs were for her own use and for the use of a family member whom she was unwilling to identify.

After Kozak had made her statement, Schouten went to speak to Glover. Wilson immediately reminded Schouten that Glover had invoked his rights. The

officers then discussed which particular right Glover had invoked. At this point, Glover interrupted the officers, clarified that he had formerly invoked his right to silence, but indicated that he did wish to talk now. At this point, the officers began asking Glover questions. Glover was not readvised of his *Miranda* rights and was not asked to sign a waiver-of-rights form.

After answering Schouten's questions, Glover was taken to talk with Kozak. After they spoke for approximately thirty minutes, Schouten requested consent to search their house. Kozak and Glover were advised of their right not to consent. Nevertheless, both agreed to the search and each signed a written consent form. That search revealed the existence of drug paraphernalia in the home.

After he was allowed to talk to Kozak, Glover was taken to a holding cell. At some point thereafter, Wilson came to Glover's cell and asked for a written statement. Wilson supplied the pen and paper and Glover wrote a short statement. Wilson was present when Glover wrote the statement and he reviewed and signed it as a witness.

Kozak and Glover were indicted on charges of possession of methamphetamine with intent to distribute, a violation of 21 U.S.C § 841(a)(1). Both moved to suppress their statements to the postal inspectors and the evidence seized from their post office box and home. The motion was referred to a

magistrate judge for the purpose of conducting an evidentiary hearing. *See* 28 U.S.C. § 636(b)(1)(B). The magistrate judge issued a detailed Report and Recommendation, recommending that the motions to suppress be denied. Following a hearing, the district court adopted the Report and Recommendation and affirmed it in all respects. Glover and Kozak then entered guilty pleas, reserving their right to appeal the district court's denial of their motions to suppress. Fed. R. Crim. P. 11(a)(2).

## II. ANALYSIS

### A. Kozak's Claims

*1. Detention and Search of the April 12, 1994, Express Mail Package*

Kozak claims that postal inspectors improperly detained the April 12, 1994, Express Mail package because they did not have a reasonable suspicion contraband was in the package. She further alleges the search warrant is invalid because the affidavit in support thereof did not establish probable cause.

In reviewing the district court's denial of a motion to suppress, we accept the court's factual findings unless they are clearly erroneous and consider the evidence in the light most favorable to the government. The ultimate question of whether a search and seizure was reasonable under the Fourth Amendment is a

question of law reviewed *de novo*. *United States v. Greenspan*, 26 F.3d 1001, 1004 (10th Cir. 1994)

In this Circuit, it is clear that "[a] temporary detention of mail for investigative purposes is not an unreasonable seizure when authorities have a reasonable suspicion of criminal activity." *United States v. Lux*, 905 F.2d 1379, 1382 (10th Cir. 1990). Thus, the issue is whether the postal inspectors had a reasonable suspicion of criminal activity at the time they detained the package. A review of the magistrate's findings leads us to conclude that they did.

On April 12, 1994, Inspector Wilson learned that an Express Mail package addressed to Kozak had arrived in Salt Lake City. The package smelled strongly of coffee. Wilson testified and the district court found that the decision to detain the package was based on the following:

> (1) his conversations with other postal inspectors and law enforcement agencies in Brigham City and Box Elder County concerning the express mail packages going to Kozak's post office box and Kozak's daughter's potential involvement in drug trafficking; (2) the fact that this package and most of the prior packages smelled like coffee; and (3) his research concerning the return addresses on the prior packages had revealed either fictitious names or addresses.

In light of the minimal intrusion occasioned by the detention, these considerations were sufficient to justify Wilson's decision to briefly detain the

-8-

package for further investigation.[2]  *See United States v. Van Leeuwen,* 397 U.S. 249, 252-53 (1970).

Once Wilson returned to the office, inspectors noted several additional facts which led Schouten to conclude they should seek a search warrant.  For instance, the package was relatively light and the cost to ship the package was $9.95.  Based on his experience, Schouten believed that it would be unusual to mail such a small amount of coffee for such a large fee.  He also learned that the designated sender of the package did not live at the listed return address and that the residents of the listed return address had not mailed an Express Mail package to Utah.  Postal inspectors then submitted the receipts for the packages shipped to Kozak over the previous several months to Detective Jim Vaughn, a handwriting expert.  Vaughn determined that several of the labels were written by the same person, even though different names and addresses were utilized.

Based on all of the information in the hands of the postal inspectors, we hold they were entitled to continue detaining the package until they could present an affidavit in support of a search warrant to a magistrate.  *See Van Leeuwen*, 397 U.S. at 253.  Because there is no indication the postal inspectors did not act

---

[2]Because we conclude that the detention of the April 12th package was supported by a "reasonable suspicion of criminal activity," we need not address Kozak's arguments regarding the constitutionality of the "mail watch" instituted by postal authorities.

expeditiously in applying for a warrant, we find the investigatory detention of this package was in conformity with the dictates of the Fourth Amendment. *See Lux*, 905 F.2d at 1382; *see also United States v. Banks*, 3 F.3d 399, 403 (11th Cir. 1993), *cert. denied*, 510 U.S. 1129 (1994); *Garmon v. Foust*, 741 F.2d 1069, 1072 (8th Cir. 1984).

Kozak argues that in validating the detention of the package, the district court improperly relied on a "cumulative" theory of reasonable suspicion. In deciding whether to detain the April 12th package, Kozak asserts that postal inspectors were obligated to exorcize from their minds any and all information not readily apparent from the surface of that particular package. Because the postal inspectors here relied on information that they developed during the course of an ongoing investigation in deciding to detain the package, Kozak asserts that the detention was improper. Kozak's view of reasonable suspicion is, at best, illogical. Law enforcement officers are not required to make decisions in a vacuum, without reference to any information other than that on the surface of the package. In fact, the exact opposite is true. *See, e.g.*, *United States v. Aldaz*, 921 F.2d 227, 228-29 (9th Cir. 1990), *cert. denied*, 501 U.S. 1207 (1991); *United States v. Hillson*, 733 F.2d 692, 695-96 (9th Cir. 1984).

In addition to her arguments on "cumulative" reasonable suspicion, Kozak argues that the postal inspectors were obligated to immediately submit the

-10-

package to a drug-detecting dog and to return the package to the mail stream if the dog did not detect the presence of drugs. Kozak relies on a line of cases holding that probable cause is established once a drug dog alerts on a package for the mistaken proposition that absent such an alert, officers are not entitled to detain the package any further. Contrary to Kozak's assertion, drug-detecting dogs have not supplanted the neutral and detached magistrate as the arbiter of probable cause. *See United States v. Claps*, 818 F. Supp. 1417, 1419 (D. Colo. 1993).[3]

Kozak next claims the affidavit in support of the search warrant contained little more than a recitation of Express Mail profile characteristics and that these characteristics are insufficient to support a finding of probable cause. The determination of whether there was a substantial basis for concluding probable cause existed must be based on the totality-of-the-circumstances. *United States v. Bishop*, 890 F.2d 212, 215 (10th Cir. 1989), *cert. denied*, 493 U.S. 1092 (1990). This court has recognized that "a magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *United States v. Martinez*,

_____

[3]We note that Kozak's argument is particularly unconvincing in light of the facts of this case. As was aptly noted by the magistrate judge, Postal Inspectors had submitted two prior packages to drug dogs, without success. Furthermore, as Schouten's affidavit indicates, some contraband simply is not detectable by the drug dogs because only a relatively small quantity of narcotic is contained in the package, the drug is double packaged with plastic, or an odor masking substance such as coffee is used.

764 F.2d 744, 746 (10th Cir. 1985) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). Accordingly, a reviewing court must not conduct a *de novo* determination of probable cause, but should instead "determine whether there is substantial evidence in the record supporting the magistrate's decision to issue a warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984); *See Gates*, 462 U.S. at 236. Applying these principles, the totality of the evidence contained in Schouten's affidavit substantially supports the conclusion that there was "a fair probability that contraband" would be found in the package. *Gates*, 462 U.S. at 238.

Schouten, the affiant, began the affidavit with a recitation of his extensive experience in drug detection and interdiction. After setting out his experience and training, Schouten proceeded to compare the package at issue with the profile common to packages containing drugs, concluding that it was very likely drugs were in the package. This court has held that "[a] magistrate is entitled to rely on the expert opinions of officers when supporting factual information is supplied in the affidavit." *United States v. Cook*, 949 F.2d 289, 292-93 (10th Cir. 1991). Accordingly, the magistrate was entitled to rely on Schouten's expert opinion as to the characteristics associated with packages that contain illegal drugs.

After laying out the profile characteristics of the April 12, 1994, Express Mail package, Schouten informed the magistrate of his continuing investigation of

the packages arriving at Kozak's post office box. For instance, Schouten averred that although a number of the packages sent to Kozak listed different senders, a police hand-writing expert believed several of the mailing certificates had been written by the same person. Furthermore, Schouten indicated officers of the Box Elder Sheriff's Office told him that confidential informants had told them that Kozak's daughters might be involved in the use of drugs. Finally, Schouten informed the magistrate that drug-detecting dogs had failed to alert on two prior packages. He indicated, however, that dogs could be fooled by the use of masking agents such as coffee and that as an experienced police officer, Kozak would be familiar with methods used to conceal controlled substances.

On appeal, Kozak asks us to review each piece of information contained in the affidavit to determine whether it, standing alone, supports a finding of probable cause. This court has specifically rejected the analytical method advocated by Kozak. *See United States v. Cardall*, 773 F.2d 1128, 1132 (10th Cir. 1985); *see also Upton*, 466 U.S. at 733. Instead, the determination must be based on the "totality" of the information contained in the affidavit. *Bishop*, 890 F.2d at 215. Reviewing the affidavit as a whole, as we are obliged to do, we conclude that the information in the affidavit provided substantial grounds for believing that contraband could be found in the Express Mail package. *Upton*,

466 U.S. at 728; *Gates*, 462 U.S. at 236. Accordingly, the search of the package pursuant to the search warrant was proper.

   *2. Kozak's Confession*

   Kozak first claims the interview conducted by officers Schouten and Summerhill was custodial in nature and her Fifth Amendment rights were violated because she was not advised of her rights under *Miranda v. Arizona*, 436 U.S. 436 (1966), either prior to or during the interview. The government acknowledges that Kozak was never *Mirandized*. Thus, the issue is whether Kozak was in custody at the time of the interview.

   To determine whether Kozak was in custody for *Miranda* purposes, we examine all facts relevant to the following inquiry: how would a reasonable person in Kozak's position have understood her situation? "If, from an objective viewpoint, someone in [Kozak's] position would reasonably believe her freedom of action had been curtailed to a 'degree associated with a formal arrest,' then she would be held in custody during the interrogation." *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)) (citation and footnote omitted). Because the determination of custody is based on the totality-of-the-circumstances, it is necessarily fact intensive. *Id.* Therefore, a district court's determination that a defendant was not

-14-

in custody for purposes of *Miranda* is reviewed for clear error. *Cordoba v. Hanrahan*, 910 F.2d 691, 693 (10th Cir.), *cert. denied*, 498 U.S. 1014 (1990).

Based upon a thorough review of the record and consideration of the totality-of-the-circumstances surrounding the interview, we conclude the district court's finding that Kozak was not in custody is not clearly erroneous. A district court finding is clearly erroneous "if it is without factual support in the record or if [this court], after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made." *Cowles v. Dow Keith Oil & Gas, Inc.*, 752 F.2d 508, 511 (10th Cir. 1985) (citation omitted), *cert. denied*, 479 U.S. 816 (1986). The district court's conclusion that a reasonable person in Kozak's position would not believe she was in custody finds more than adequate support in the record.

The sequence of events leading up to Kozak's confession is as follows. When Schouten and Summerhill arrived at Kozak's house, they asked if she would be willing to talk with them and specifically informed her that she was not under arrest. Kozak was never handcuffed and neither officer exhibited any sign of force or intimidation.

Once Schouten, Summerhill, and Kozak arrived at the sheriff's office, they went directly into Summerhill's office.[4]  Kozak was again informed that she was not under arrest.  The conversation that followed took place in Summerhill's office rather than in an interrogation room.  Kozak indicated that she was willing to talk to Schouten and Summerhill, but insisted that the conversation not be taped.  After Schouten agreed not to tape the conversation, Kozak admitted that she knew the package contained methamphetamine and that she had received similar packages in the past.  The conversation lasted no more than twenty minutes.  Kozak never indicated at any time during the conversation that she wanted to stop and never asked for an attorney.  In light of this sequence of events and the facts as found by the district court, the district court's conclusion that Kozak was not in custody at the time of the interview is not clearly erroneous and is, therefore, affirmed.[5]

---

[4]The mere fact that the conversation between the officers and Kozak took place at the sheriff's office does not in and of itself establish custody without other factors supporting a restraint on Kozak's freedom of movement to a degree associated with formal arrest. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam).

[5]Kozak makes much of the fact that she had to ask permission to go outside and smoke and was accompanied by an officer when she did so.  The problem with Kozak's argument is that it is devoid of a critical time element.  The critical point is whether Kozak was in custody *at the time of the conversation*.  As noted by the district court, the record is unclear as to when Kozak was accompanied outside for a smoke break.  Because Kozak has not demonstrated the incident occurred before or during the conversation, it does not shed any light on whether she was in custody at the time of the confession.  Kozak's assertion that she was

-16-

In addition to her *Miranda* claim, Kozak asserts that the district court should have excluded her confession because it was not voluntarily given. Incriminating statements obtained by government acts, threats, or promises that permit the defendant's will to be overborne run afoul of the Fifth Amendment and are inadmissible at trial as evidence of guilt. *Malloy v. Hogan*, 378 U.S. 1, 7 (1964). In determining whether a particular confession is coerced, we consider the following factors: (1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of her constitutional rights; and (5) whether the defendant was subjected to physical punishment. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The determination of voluntariness is based on the totality-of-the-circumstances; none of the single factors listed above is determinative. *Id.* Accordingly, this court must be mindful of all of the circumstances surrounding a defendant's interrogation, including the particular defendant's characteristics. *See id.*

When a defendant challenges the use of her statements on the ground that they were involuntary, it is the duty of this court "to examine the entire record and make an independent determination of the ultimate issue of voluntariness."

---

accompanied outside to smoke *at some point in time* does not add anything to our analysis.

*Davis v. North Carolina*, 384 U.S. 737, 741-42 (1966). Nevertheless, the district court's rulings regarding "subsidiary factual questions, such as whether the police intimidated or threatened a suspect or whether a suspect was particularly susceptible to police coercion, are subject to review under the clearly erroneous standard." *United States v. Chalan*, 812 F.2d 1302, 1307-08 (10th Cir. 1987).

We conclude, based upon an independent evaluation of the record and with appropriate deference to the district court's findings of fact, that Kozak's confession was voluntary. Several key facts mandate this conclusion. First, although Kozak was not specifically informed that she did not have to answer any questions, she was informed at least twice that she was not under arrest. Furthermore, Kozak testified that based on her experience as a police officer, she was aware of her *Miranda* rights and knew that they applied to her. Second, the conversation was not excessively long, lasting no more than twenty minutes. Third, in light of Kozak's experience, the environment in which the conversation took place was not unduly coercive. The conversation took place in Summerhill's office at the Box Elder Sheriff's Office, rather than in an interrogation room. Furthermore, Kozak was extremely familiar with the sheriff's office due to her position with the Brigham City Police Department. Fourth, Kozak had been employed with the Brigham City Police Department as a detective for eleven years and was well versed in law enforcement procedures. Fifth, there is

-18-

absolutely no evidence in the record tending to show that Kozak was unusually susceptible to coercion because of age, lack of education, or intelligence. Finally, and of particular importance, Kozak testified at the suppression hearing that she made a conscious decision to cooperate with Schouten and Summerhill because she wanted to help Glover and to be allowed to see him. These types of personal psychological pressures do not amount to official coercion rendering a confession involuntary. *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). Furthermore, although Kozak argues on appeal that her confession was coerced by promises of leniency (*i.e.*, a release on her own recognizance), she testified at the suppression hearing that those discussions did not occur until after the interview. In light of these facts, it is clear that Kozak's will was not overborne and that her confession was the product of her own free will.

## B. Glover's Claims

### 1. Glover's Confession

Glover asserts that his confession should be suppressed because: (1) his right to cut off questioning was not scrupulously honored by the postal inspectors after he invoked his right to remain silent; and (2) even assuming that Glover waived his right to remain silent, such waiver was not voluntarily, knowingly and intelligently given.

Glover first contends that his right to remain silent was not scrupulously honored by law enforcement officers. Glover's argument is premised on the Supreme Court decision in *Michigan v. Mosley*, 423 U.S. 96 (1975). In *Mosley*, the Supreme Court addressed whether a resumption of questioning is permissible where a person in custody has invoked his right to remain silent. *Id.* at 101. The Court indicated that the resolution of this issue was governed by the following passage from *Miranda:* "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 100 (quoting *Miranda*, 384 U.S. at 473-74). Thereafter, officers can reinitiate questioning only if: (1) at the time the defendant invoked his right to remain silent, the questioning ceased; (2) a substantial interval passed before the second interrogation; (3) the defendant was given a fresh set of *Miranda* warnings; and (4) the subject of the second interrogation was unrelated to the first. *See id.* at 104-105.

Glover's reliance on *Mosely* is misplaced. The key issue addressed by *Mosley* is when is it permissible *for police officers to initiate* questioning or interrogation of a person in custody after that person has exercised her right to remain silent. What *Mosely* does not address are circumstances, such as those found in the case at hand, where the individual in custody, rather than the police, initiates further discussion.

-20-

Although the Supreme Court was focusing on a different issue, *Edwards v. Arizona*, 451 U.S. 477 (1981), is instructive on the issue at hand. Significantly, the *Edwards* Court held that a person in custody, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police*." 451 U.S. at 484-85 (emphasis added). Although it found that Edwards did not validly waive his right to counsel because the police had initiated the interrogation, the Court added that had Edwards initiated the meeting with the police after he had asked for an attorney the result would have been different. According to the Court, "nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to [an arrestee's] voluntary, volunteered statements and using them against him at trial." *Id*. at 485.

Similarly, it is apparent that Glover volunteered to talk with the postal inspectors as a result of his own initiative rather than any interrogation or questioning relating to the incident by the postal inspectors. The evidence established that after Glover was arrested and indicated to the postal inspectors that he did not want to talk, all questioning of him concerning the incident ceased. Glover concedes this fact. Glover was then transported to the Box Elder County Sheriff's office where he was taken to an office rather than to an interrogation

-21-

room. Glover was accompanied by several individuals, including Inspectors Wilson and, at some point, Collins. Again, Glover was not questioned by either of these two individuals, with the possible exception of Wilson's questions concerning background information.

At approximately 7:30 a.m., Schouten entered the room and began to talk with Glover, at which point Wilson reminded Schouten that Glover had invoked his rights. There was some confusion by the postal inspectors as to which rights he had invoked. One of the postal inspectors believed that Glover wanted an attorney. Glover then interjected by clarifying that he had not asked for an attorney, giving his reasons why, but that he had said he did not want to talk. Glover then volunteered that he wished to talk now.[6] The evidence indicates that Glover was not readvised of his *Miranda* rights; however, any requirement to do so would have been redundant in light of the distinction Glover offered concerning which specific right he had invoked and the knowledge that Glover was a seasoned police officer. *See United States v. Pugh*, 25 F.3d 669, 673 (8th Cir. 1994).

---

[6]Despite Glover's differing recollection of the events, the district court found that the testimony of Inspectors Collins, Wilson, and Schouten was credible and that Glover's was not. Considering the great deference afforded to a district court's determination of credibility, this determination is certainly not clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985); *United States v. Gobey*, 12 F.3d 964, 967 (10th Cir. 1993) (citing *Anderson*).

Based on the specific facts outlined above, this court concludes Glover's right to cut off questioning was scrupulously honored after Glover invoked his right to remain silent. Furthermore, because Glover's subsequent willingness to talk was volunteered by him and did not result from interrogation or questioning initiated by the postal inspectors, the *Mosley* analysis urged by Glover does not apply. *See United States v. Moreno-Flores*, 33 F.3d 1164, 1168-70 (9th Cir. 1994). Moreover, the circumstances in the case at hand merely entail a situation where Glover, informed of his rights, chose to exercise his right to control the time at which questioning occurred. There is absolutely no evidence of any efforts by the postal inspectors to wear down Glover's resistance so that he would change his mind and talk.

Having determined that Glover was not questioned in violation of *Miranda*, the question becomes whether Glover's waiver of the right to remain silent was voluntarily, knowingly, and intelligently given. *Miranda* provides that where a suspect has been advised of his rights against self-incrimination, he may waive these rights "'provided the waiver is made voluntarily, knowingly, and intelligently.'" *United States v. Hernandez*, 913 F.2d 1506, 1509 (10th Cir. 1990) (quoting *Miranda*, 384 U.S. at 444), *cert. denied*, 499 U.S. 908 (1991). The Supreme Court has articulated the following two requirements for a valid waiver:

> First, the relinquishment of the right must have been voluntary in the
> sense that it was the product of a free and deliberate choice rather

-23-

than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986). In making this determination, we evaluate the particular facts and circumstances surrounding the waiver, including the background, experience, and conduct of the accused. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

In arguing that his waiver was not voluntarily made, Glover maintains that he was subjected to (1) intimidation by Schouten, (2) coercion when his right to cut off questioning was not adhered to, and (3) deception when the postal inspectors made promises that Glover would be released on his own recognizance if he cooperated. We find Glover's arguments unconvincing. Glover was a seasoned police officer at the time of his arrest. He testified that he knew his rights under *Miranda* and understood that they applied to him. It is also undisputed that Glover was advised of his rights at the time he was arrested. Additionally, at the time Glover made his initial statement to the postal inspectors, no more than a couple of hours had passed since his arrest; there is absolutely no evidence to suggest that Glover was subjected to a lengthy interrogation. There is also no evidence to suggest that Glover was in any pain or that he was uncomfortable in any way. In fact, the interview with Glover took place in an office rather than an interrogation room and Glover was not

handcuffed. There is essentially no evidence that Glover was intimidated or coerced into waiving his constitutional rights.

Glover also asserts that he was deceived into waiving his rights by a false promise of an "O.R." release[7] if he cooperated. All of the postal inspectors testified that they did not recall any discussion or promises made concerning an "O.R." release. Schouten and Collins did recall some discussion as to Kozak and Glover's concern about being processed in Box Elder County. Glover testified, on the other hand, that Schouten told him during his initial interview that he would be able to see a magistrate by the end of the day and that there was a possibility that he would be released on his own recognizance if he cooperated. Regardless of what representations may have been made to Glover, the key point is that Glover testified he was also told the determination of a release on his own recognizance was ultimately up to the magistrate judge. As the government points out, "[a] promise to bring any cooperation on the part of the defendant to the [court's] . . . attention does not constitute a coercive promise sufficient to render any subsequent statements involuntary and inadmissible." *United States v. Baldacchino,* 762 F.2d 170, 179 (1st Cir. 1985).

The first requirement of a valid waiver is clearly satisfied. Glover's incriminating statements were the product of his free and deliberate choice and

---

[7]An "O.R." release refers to a release on the individual's own recognizance.

did not result from any acts of intimidation, coercion, or deception on the part of the postal inspectors. As to the second requirement that the waiver be made with full awareness of the right being abandoned and the potential consequences, based on the facts set forth above concerning Glover's background and experience as a police officer, there is little doubt that Glover knowingly and intelligently waived his rights. *See McFadden v. Garraghty*, 820 F.2d 654, 661 (4th Cir. 1987) (experience as police officer relevant in determining whether defendant was familiar with *Miranda* and its implications and that his confessions were voluntarily made).

### 2. *Delay in Bringing Glover Before a Magistrate*

Glover contends that the district court should have suppressed his written confession because it was obtained in violation of the rule set out in *McNabb v. United States*, 318 U.S. 332 (1943), and *Mallory v. United States*, 354 U.S. 449 (1957). More specifically, Glover asserts that his written confession is invalid because it was obtained more than six hours after his arrest but before he was brought in front of a magistrate.

The *McNabb-Mallory* rule has been codified at 18 U.S.C. § 3501(c), which provides:

> In any criminal prosecution by the United States . . . , a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not

be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States . . . if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention . . . .

In interpreting section 3501(c), this court has stated that "non-compliance with the six hour rule does not *ipso facto* render a confession inadmissible." *United States v. Shoemaker*, 542 F.2d 561, 563 (10th Cir.), *cert. denied*, 429 U.S. 1004 (1976). Instead, "[v]oluntariness is the sole test for admissibility of a confession." *Shoemaker*, 542 F.2d at 563. Although a judge must consider the amount of time that elapsed between arrest and arraignment in determining whether a confession made during that period is voluntary, "[s]uch a consideration is only a factor, and need not be conclusive." *Id.*

With these considerations in mind, it is relatively easy to resolve Glover's claim. As noted by the magistrate, Glover has not produced any evidence that the delay in bringing him before a magistrate overbore his ability to exercise his own freewill. In fact, based on the testimony at the suppression hearing, the district court found, as a matter of fact, that Glover's choice to write the statement was voluntary and was not a product of the delay. Furthermore, the record clearly demonstrates, and the district court found as a matter of fact, that the delay in bringing Glover before a magistrate was not part of a plot or ploy to obtain a

confession. Instead, the delay occurred because the cooperating officers had not yet decided which agency would prosecute the drug offenses. Because the benchmark of admissibility of a confession is voluntariness and because there is no question that Glover made the written statement voluntarily, the short delay in bringing Glover before a magistrate does not render that statement inadmissible. *Shoemaker*, 542 F.2d at 563; *Short*, 947 F.2d at 1451.

## C. Joint Claim: Search of Glover and Kozak's Home

Glover and Kozak assert that the district court erred when it refused to suppress drug paraphernalia found during a search of their home. Although they acknowledge that they signed written consent forms allowing officers to search the home, both Glover and Kozak contend that the consent was not freely and voluntarily given.

A warrantless search of a suspect's premises is unreasonable per se under the Fourth Amendment unless the government shows that the search falls within one of a carefully defined set of exceptions, such as a valid consent. *United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992). Whether a consent to search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined by the totality-of-the-circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). In determining whether a

consent to search is voluntary, a court should consider the following: physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant. *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994). Evidence obtained by a consent-based search is admissible only if the government (1) produces clear and positive testimony that the consent was unequivocal, specific, and freely given, and (2) proves that the consent was given without duress or coercion, express or implied. *Butler*, 966 F.2d at 562. Here there is no question that Glover and Kozak consented to the search and that the consent was specific. Thus, the issue is whether the consent was the result of duress or coercion.

Glover and Kozak assert that their consent was not voluntary because it was based on a promise on the part of postal inspectors to process them outside of Box Elder County if they agreed to a search of their house. The district court found, however, that the consent to search was voluntarily given, even assuming that officers had discussed where Glover and Kozak would be processed. Examining the totality-of-the-circumstances, the district court noted that both Kozak and Glover were experienced police officers and that both had testified that they understood their rights under *Miranda*. Furthermore, both were specifically informed that they had the right to decline the request and the officers made no

efforts to exert force of any kind on Glover or Kozak. Additionally, Kozak and Glover not only gave their verbal consent to the search, they also both executed written consents to the search. Finally, the government presented evidence that Kozak had given her house keys to Schouten and that both Kozak and Glover told the officers where they could find certain items in the home. Based on the totalilty of these factors, the district court concluded that "Kozak and Glover's consent to search the house was unequivocal and specific and that it was freely, voluntarily and intelligently given."

The record supports the district court's findings that Kozak and Glover voluntarily consented to the search of their home; those findings are, therefore, not clearly erroneous. *United States v. Iribe*, 11 F.3d 1553, 1557 (10th Cir. 1995) (clearly erroneous standard apples to trial court's finding of whether consent to search was voluntary). Because Glover and Kozak freely consented to the search and the search pursuant to that consent was proper, the district court did not err in refusing to suppress the evidence found during the search of the home.

### III. CONCLUSION

For all of the reasons set out above, the order of the district court denying suppression is hereby **AFFIRMED**.