**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                           No. 97-4266

DELMER VICTOR LEONARD,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Virginia, at Charlottesville.
James H. Michael, Jr., Senior District Judge.
(CR-95-24)

Argued: March 6, 1997

Decided: April 6, 1998

Before MOTZ, Circuit Judge, PHILLIPS, Senior Circuit Judge, and
KEELEY, United States District Judge for the
Northern District of West Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Robert Cameron Stone, Jr., Martinsburg, West Virginia,
for Appellant. Jean Barrett Hudson, Assistant United States Attorney,
Charlottesville, Virginia, for Appellee. **ON BRIEF:** Robert P.
Crouch, Jr., United States Attorney, Charlottesville, Virginia, for
Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

On May 9, 1995, a federal grand jury returned a six-count indict-
ment against Delmer Leonard, charging him with violations of 18
U.S.C.A. §§ 844(d), 924(c)(1), 924(h), and 1716 (West 1984 & Supp.
1998), and 26 U.S.C.A. §§ 5822, 5841, 5861(d), 5861(f), and 5871
(West 1989), in connection with an explosive device mailed to his
former wife. Leonard moved to suppress a written confession he
made to United States postal inspectors in January 1995. The district
court denied the motion. After a competency hearing at which the dis-
trict court determined that Leonard was fit to stand trial, Leonard
entered into a plea agreement; he pled guilty to all counts except the
§ 924(c)(1) charge, which the government agreed to dismiss. After a
sentencing hearing, the district court sentenced Leonard to 216
months of imprisonment plus three years of supervised release. Leon-
ard now appeals, asserting that the district court erred by denying his
motion to suppress. Finding no reversible error, we affirm.

I.

In December 1994, Patricia Smith, Leonard's former wife, received
an explosive device disguised as a Christmas ornament. When Smith
plugged the device into an electrical socket, the device exploded and
caused burns and lacerations to her face. Almost immediately thereaf-
ter, the United States Postal Service began investigating the incident.

According to testimony presented at Leonard's suppression hear-
ing, postal inspectors contacted Leonard on two occasions. On
December 22, 1994, Inspector Leslie Lauziere and other agents vis-
ited Leonard at his trailer in West Virginia. Lauziere spoke briefly
with Leonard, and Leonard permitted the agents to search his trailer.
Subsequently, on January 7, 1995, Lauziere again went to Leonard's
trailer, this time with another postal inspector, Terry Flug. Lauziere

2

and Flug discussed the investigation with Leonard for about two hours. Leonard agreed to answer questions, never asked the inspectors to leave, never asked for an attorney, and was not physically detained.

The inspectors asked Leonard to submit voluntarily to a polygraph test. Leonard agreed, and followed the inspectors in his own car to a local Econo Lodge. The inspectors escorted Leonard to a room where still another postal inspector, polygraph examiner John Griffith, waited with a polygraph machine. Lauziere explained to Griffith that Leonard had some concerns about taking a polygraph, and Griffith once again explained to Leonard that he could decline to take the polygraph and that he could cease participation at any time.

Griffith presented Leonard with a "Warning and Waiver of Rights" form. He advised Leonard of his Miranda rights "point by point" and explained the waiver portion of the form, which stated:

> I am willing to discuss subjects presented and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

At approximately 4:00 p.m., Leonard signed both the warning and waiver portions of the form and agreed to answer questions. Leonard did not ask to make any telephone calls. He did not ask to leave. He did not ask to speak with an attorney. He retained his car keys, and was not physically detained in any manner.

Lauziere left the room and Griffith administered the polygraph. Griffith began the post-polygraph interview by asking Leonard how he thought he did. Leonard responded, "Piss poor probably," to which Griffith replied, "Yeah, you did." Griffith then explained to Leonard that Leonard performed poorly on the questions relating to the explosive device. When Leonard asked why, Griffith replied, "Because you, you had something to do with it. . . . You made it. You sent it. You put it together." Griffith continued, stating:

> the thing is this, Inspector Lauziere has got enough circumstantial evidence to work up a good case, and he's going to

3

do it. . . . [W]hen he puts this together and he presents it to a U.S. attorney for prosecution, and you get indicted and it goes to trial . . . it's gonna come right down on you. He told you . . . don't be in front of the train when it . .. takes off. Be on the train. You know. Be cooperative. The first thing any judge is going to say is Was he cooperative? . .. And so what I'm saying is, now do what's best for [yourself]. And that is get this over with, behind you.

Leonard expressed concern about Griffith's comments, declaring, "Well, there ain't no, no guarantee about it." To this statement Griffith responded:

Well there is. There is a guarantee. That's the guarantee. The guarantee is if you do that at this point, if you own up to it, and you say I made a mistake. . . . [The judge] can sympathize with that. Judges sit there every day and hear people come in and say, "I didn't do it. I didn't do it." And then the proof comes down and they did do it -- Bam! He hammers them. He hammers them and hammers them and hammers them.

Later, as Griffith's interview neared its end and Leonard approached the point of confession, Leonard stated"I'll go to jail and die." Again Griffith responded: "That's not true. That's not true at all. . . . You could very well get probation. You know. We'll see. We'll see." Griffith told Leonard "I want you to say you did it `cause you did. I know you did it. Try saying you did it. I want to be able to go to Inspector Lauziere and say `He wants to come clean.'" After that, Leonard admitted to Griffith that he "didn't want to hurt her," but instead meant only to "scare her." At that point, Griffith left to get Lauziere.

Approximately three hours had elapsed when Griffith"advised [him] that Mr. Leonard had failed the polygraph examination and was ready to give a statement relative to this crime." Lauziere escorted Leonard to another hotel room, where Lauziere and Flug obtained a statement. Leonard did not ask to leave or to contact an attorney, nor was he ever physically detained.

4

Lauziere questioned Leonard regarding the bomb, and presented Leonard with an affidavit form. Lauziere read Leonard the form's introductory paragraph twice, which again advised Leonard of his <u>Miranda</u> rights and provided that the statement was given "voluntarily and without threat or promise." Leonard suggested that "it probably would take him a long time to write a statement." Lauziere testified that, based on Leonard's handling of documents while in his trailer, it appeared that Leonard could read and write, but nonetheless Lauziere offered and Leonard agreed that Lauziere would write the statement for Leonard.

Lauziere went over the statement several times with Leonard "word for word, sentence for sentence," and allowed Leonard to make changes. Leonard initialed each change and each page, and signed the affidavit at 8:10 p.m. Lauziere then contacted the U.S. Attorney's office and decided to take Leonard into custody. Lauziere testified that he saw Leonard upset and crying just after the polygraph examination, and again after the statement was written. Griffith also testified at the suppression hearing, essentially buttressing Lauziere's testimony.

Leonard called two witnesses: Dan Seiler, a polygraph expert, who testified that the polygraph results were inconclusive, and Dr. Leroy Stone, a clinical psychologist, who testified that Leonard has an IQ of 77, which puts him on the borderline of mental retardation. Dr. Stone also stated that Leonard is overly compliant to persons in positions of authority, and that Griffith's post-polygraph discussion with Leonard was highly persuasive to Leonard. Moreover, Dr. Stone opined, on the basis of test results, that Leonard did not adequately understand the <u>Miranda</u> warnings or the implications of any waiver of them.

The district court ruled that Leonard's statement was voluntary and denied his motion to suppress. In doing so, the court quickly recounted the evidence and made several findings of fact. The court found: (1) postal inspectors went to Leonard's trailer to conduct an investigation and to interrogate Leonard; (2) they proposed he take a polygraph, and he agreed to do so; (3) he followed the inspectors to the Econo Lodge, "[b]ut certainly [he] had every opportunity to say no;" and (4) "no promise [was] made[to Leonard] by Mr. Griffith or

5

anybody else. He indicated that there might be a possibility of parole but certainly no promise . . . of leniency . . . .[T]he statements made by Mr. Griffith may have been persuasive but [were] not coercive."

II.

A.

Initially, Leonard contends that his confession resulted from a custodial interrogation in which government agents failed to properly inform him of his Miranda rights or failed to obtain a valid waiver of those rights. See Michigan v. Mosley, 423 U.S. 96, 99-100 (1975) (even wholly voluntary confession cannot be admitted where there has been a violation of the Miranda requirements for custodial interrogation).

Of course, a defendant who is not in custody has no entitlement to Miranda warnings. "An individual is `in custody' for Miranda purposes when, under the totality of the circumstances, the suspect's freedom of action is curtailed to a degree associated with formal arrest" such that "a reasonable person in[the same] position would have understood that he was in custody." United States v. Howard, 115 F.3d 1151, 1154 (4th Cir. 1997) (internal quotation marks omitted); see United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997).

The district court found that the inspectors asked Leonard to take the polygraph test, and he agreed even though "he had every opportunity to say no." Leonard followed the inspectors to a hotel in his own car. He retained his keys, the room was unlocked, he was not physically restrained in any manner, and he was told that he did not have to take the polygraph test and that he could stop at any time. Under Howard, this is not custody for Miranda purposes. Cf. Howard, 115 F.3d at 1154-55 (defendant driven by DEA agents to probation office and questioned as suspect in crime was not "in custody" for Miranda purposes where he voluntarily agreed to accompany the officers, was not physically restrained, the officers brandished no weapons, and there was no evidence of coercion).

6

B.

Even if he was not in custody and so not entitled to Miranda warnings, Leonard maintains that his confession was involuntary and so should have been suppressed. We make a de novo review of the ultimate question of voluntariness, while bound to accept the district court's factual findings unless clearly erroneous. See United States v. Braxton, 112 F.3d 777, 781 (4th Cir.) (en banc), cert. denied, 118 S. Ct. 192 (1997); Glover, 104 F.3d at 1579-80.

As we recently stated in Braxton, the proper test to determine if a statement was voluntary is whether the defendant's will was overborne or his capacity for self-determination critically impaired. Braxton, 112 F.3d at 781; see United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987); United States v. Wertz, 625 F.2d 1128, 1133 (4th Cir. 1980). This determination involves consideration of the totality of the circumstances surrounding the confession. Factors to consider in the voluntariness determination include the defendant's age, education, level of intelligence, the setting of the interview, the details of the interrogation, the duration of questioning, the use of physical coercion or deprivation, the defendant's experience with the criminal justice system, and whether the defendant has been advised of his Miranda rights. See Arizona v. Fulminante, 499 U.S. 279, 285-86 & n.2 (1991); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Watson v. Detella, 122 F.3d 450, 453 (7th Cir. 1997); Braxton, 112 F.3d at 781; Glover, 104 F.3d at 1579; Pelton, 835 F.2d at 1071-72; Wertz, 625 F.2d at 1134.

Leonard contends that the nature of Griffith's questioning, combined with the setting and duration of the interrogation and Leonard's low education level and borderline intelligence, rendered the confession involuntary. In particular, he points to Griffith's repeated use of the word "guarantee," his repeated suggestion that the court would likely "hammer" Leonard if Leonard did not cooperate, and his suggestion that Leonard might receive probation. Although several of Griffith's statements cause us great concern -- especially statements regarding the possibility of probation when probation clearly would not follow and remarks such as "[t]ry saying you did it" -- we are not convinced, under the totality of the circumstances as recently inter-

7

preted in Braxton, that any coercion existed or that Leonard's will was overborne.

The district court explicitly found that the postal inspectors made no promises of leniency or parole to Leonard. Our review of the record does not compel a contrary finding. Inspector Griffith used the word "guarantee" in relation to his representations that a court would look favorably upon a decision by Leonard to cooperate, and would be less likely to "hammer" Leonard than if he forced a drawn out investigation. That a "suspect's cooperation, by lightening the government's burdens of investigation and prosecution, is looked upon favorably by prosecutors and judges" is "very close to being a truism." United States v. Baldwin, 60 F.3d 363, 365-66 (7th Cir. 1995), vacated on other grounds, 116 S. Ct. 1873 (1996), on remand, No. 94-1025, 1997 WL 471328 (7th Cir. Aug. 14, 1997), cert. denied, 118 S. Ct. 390 (1997); see also Glover, 104 F.3d at 1582 (discussions about cooperation and promises to make cooperation known to the prosecutor and court do not render a confession involuntary); United States v. Bautista-Avila, 6 F.3d 1360, 1364 (9th Cir. 1993) (same); Pelton, 835 F.2d at 1073 (same); United States v. Shears, 762 F.2d 397, 401-02 (4th Cir. 1985) (same). Although government agents should avoid using the word "guarantee" during an interrogation, its use in these circumstances does not amount to a coercive promise of leniency.

Moreover, Inspector Griffith clearly did not promise probation to Leonard. Rather, he stated, "You may very well get probation. . . . We'll see. We'll see." (Emphasis added.) This statement does not amount to a promise. Examination of the full context of the statement confirms this conclusion. As Griffith testified, he made this statement to Leonard after Leonard expressed concern that"[e]verything's going to end" and he would just go to jail and die. In Braxton, we reiterated that courts cannot "focus on a single factor," a single circumstance, or single statement in determining voluntariness. Braxton, 112 F.3d at 785. When properly viewed in context, Griffith's statement was no more than an attempt at emotional reassurance.

Leonard's borderline mental capacity and low level of education also concern us, but do not compel suppression of the confession. A defendant's personal characteristics are important to the voluntariness

8

determination because they reveal his susceptibility to subtle forms of coercion. See United States v. Huynh, 60 F.3d 1386, 1388 (9th Cir. 1995); Henry v. Dees, 658 F.2d 406, 409 (5th Cir. 1981). Furthermore, in circumstances where agents know or should know a defendant has a mental deficiency, they must employ particular care in interrogating the defendant. See United States v. Hall, 93 F.3d 1337, 1346 (7th Cir. 1996); Henry, 658 F.2d at 411. A defendant's individual characteristics, however, are insufficient by themselves to render a confession involuntary absent other circumstances that demonstrate some form of official coercion. See Colorado v. Connelly, 479 U.S. 157, 167 (1986); Watson, 122 F.3d at 453; United States v. Murphy, 107 F.3d 1199, 1206 (6th Cir. 1997); United States v. Rohrbach, 813 F.2d 142, 144 (8th Cir. 1987).

The totality of the circumstances surrounding Leonard's confession did not render that confession involuntary. The interrogation occurred in a hotel room to which Leonard freely went and from which he was free to leave, and the interrogation only lasted a few hours. Griffith explained Leonard's Miranda rights to him several times, and Leonard signed a waiver of those rights. Leonard later signed an affidavit that again acknowledged his Miranda rights and bore language declaring that he was not coerced or promised anything. At the time of the interrogation, Leonard had attained the age of 48 and had past experience with the criminal justice system. Leonard was neither physically restrained nor deprived in any manner. Leonard's low level of education and intelligence raise concerns, but, under the totality of the circumstances, we cannot conclude that his confession was involuntary. See Braxton, 112 F.3d at 784-85. Cf. Murphy, 107 F.3d at 1205 (placement of defendant in police cruiser did not render statement involuntary even in light of defendant's limited mental capacity); Correll v. Thompson, 63 F.3d 1279, 1290-91 (4th Cir. 1995) (confession voluntary when, although defendant had IQ of 68, he had received Miranda warnings in the past, was in custody only about seven hours, there was no physical coercion or deprivation, and he was not induced by promises); Pelton, 835 F.2d at 1073 (setting of interrogation did not support finding of coercion where held in public hotel and defendant free to move about or leave).

9

III.

For the foregoing reasons, the district court's denial of Leonard's motion to suppress is hereby

AFFIRMED.

10