**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 11 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

QUINCY DARNELL BLUE,

Defendant - Appellant.

No. 03-3334

(D. Kansas)

(D.C. No. 03-CR-10058-WEB)

## ORDER AND JUDGMENT[*]

Before **KELLY**, **ANDERSON**, and **LUCERO**, Circuit Judges.

Quincy Darnell Blue ("Blue") was convicted following a jury trial of one count of bank robbery, in violation of 18 U.S.C. § 2113(a), and one count of carrying and using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2. He was sentenced to 300 months in prison for the bank robbery and 60 consecutive months for the firearms

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

charge, and was ordered to pay a $200 fine.[1]  On appeal, Blue argues that the

district court erred by failing to suppress his allegedly involuntary admission that

he committed the robbery because questioning authorities employed a "ruse" to

obtain the admission.  We affirm.


# BACKGROUND

On the afternoon of March 31, 2003, Blue entered the Home Bank and

Trust in Wichita, Kansas, brandished a handgun, and directed a teller to put

money in a bag.  A codefendant, James Monroe Morris,[2] drove his blue Buick

Regal from the bank as the getaway car.  A concerned citizen saw Blue and

Morris leave the bank, followed them, and called police with a description of the

getaway vehicle.  The defendants were then seen swapping the Buick for a brown,

four-door Cadillac with Kansas license plates, number "UVC-890."  It was

---

[1]The district court enhanced Blue's sentence under the United States Sentencing Commission, Guidelines Manual ("USSG"), after determining that he was a career offender under USSG §4B1.1 and that the bank which he robbed was a "financial institution" under USSG §2B3.1(b)(1).  Defense counsel initially argued that we should remand this case for resentencing in light of the Supreme Court's decision in Blakely v. Washington, 124 S. Ct. 2531 (2004).  Counsel argued that the USSG were wholly unconstitutional and that the enhancements were found by the judge rather than the jury.  Both parties briefed these issues.  At oral argument, however, which occurred two days after the Supreme Court issued United States v. Booker, 125 S. Ct. 738 (2005), Blue's counsel withdrew her Blakely arguments.  We therefore do not consider them.

[2]Morris reached a plea agreement with the prosecution.

subsequently determined that this vehicle was owned by Blue's girlfriend, Laila Hail ("Hail").

Two officers on patrol heard a report relaying this information over the police radio. They then saw the brown Cadillac with the UVC-890 license plates occupied by two men matching the suspects' description. The vehicle was stopped, and officers saw a loaded .25-caliber handgun in plain view on the front seat. Officers also found a coat in the back seat that was thought to be worn by Blue when he committed the robbery. Also plainly visible was a large wad of bills sticking out of Blue's pants pocket. Both men were ordered to exit the vehicle. Blue was arrested and searched, and officers retrieved the money, which totaled $1,927 and which included "bait bills" from the bank.

Blue was taken to the Federal Bureau of Investigation offices around 5:30 p.m. that day. He was placed in an interview room, offered a can of soda, and was fingerprinted and photographed. Agent Tracy Jenkins then presented Blue with an "Advice of Rights" form informing Blue of each of his Miranda rights. The form also advised Blue that he would waive his rights by signing the form. Blue wrote the word "yes" and his initials next to each right, and then signed the document.

When Jenkins first asked about the bank robbery, Blue denied his involvement in the crime and stated that he had borrowed Hail's brown Cadillac

for a drug deal. He stated that the cash was his and denied owning or using the handgun. Jenkins responded by telling Blue that if the gun was not his, it must be Hail's. The officer then laid Hail's criminal history records and mug shots in front of Blue.

Jenkins then left the room and told an officer to send a text message, already composed by Jenkins, to Jenkins' pager. Jenkins returned to the interview and handed the pager to Blue so Blue could read the message for himself. Jenkins testified that the message was part of a "simulated information" technique. The message purported to be from another FBI officer who was en route to interview Hail. The message asked Jenkins what questions he wanted asked of Hail. The message also said something to the effect that Hail was already in custody and could be brought to the FBI office. The interview was then halted, but a short time later, without further questioning, Blue changed his story and admitted to the bank robbery and gave agents specific details about the crime.

Blue filed a pretrial motion to suppress his statements on the grounds that (1) they were the fruit of an illegal detention and search and (2) they were involuntary. The district court conducted a hearing on Blue's motion[3] and then

---

[3]The issue of voluntariness was raised in a supplemental motion below after the suppression hearing was held. Blue, however, did not request a second hearing because the voluntariness motion was based on testimony already provided at the suppression hearing.

denied the motion to suppress, finding that the search and detention were not illegal and that Blue's will was not overcome by the agents' trickery.

The case went to trial, where Blue testified that the "simulated information" did not work because he never actually believed that Hail was in custody. He also testified that he never admitted committing the robbery. The following testimony was elicited from Blue on direct examination:

> [THE DEFENDANT]: . . . So then he [Agent Jenkins] got up . . . and he came back and he had the pager and he say, like "You say that gun wasn't yours?" I say, "Man, I told you it wasn't mine," and then he's like, "Well we going to go get your girlfriend and we going to ask her about it," and he showed me in this pager. . . . It says, "We got the Layla Hale [sic] girl . . . in custody and the boy," talking about her son, and it was like, "What you want us to charge the girl with?" And it said, "What you want us to do with her boy?"
> . . . I said, "If you got Layla, go and get her and bring her. Let me see her." He said, "Why would I do that?" I said, "*Cause you ain't got her*," and he like, "Yeah we got her." I said, "*Well, I don't think you got her*," and then I just—we just left it at that and we just sit.
> Q [THE PROSECUTOR]: Okay. So when you were making those statements to the FBI with what appears to say you are acknowledging you participated in the bank robbery, were you making an admission that you had committed the robbery?
> A: *No . . . I wasn't actually admitting that I committed no robbery.* I told them, I kept telling him I didn't know nothing about no robbery and he kept insinuating I knew something about a robbery, so I just started, when he say, "You went in there with a mask on," I said, "Yeah if you say so."
> . . . I start getting agitated by him saying, "You did this. You did this. You did this," and I kept telling him I didn't, so I just like, "Whatever you say, okay."

-5-

Tr. of Jury Trial at 56-57, R. Vol. IV (emphasis added). On cross examination,

Blue testified similarly:

> Q [THE PROSECUTOR]: Mr. Blue, this story that your lawyer questioned all the FBI agents about, about this information about Layla Hale [sic], that didn't really have any effect on you, did it?
> A [THE DEFENDANT]: Actually, you know, when he showed me the pager, you know, *I mean, it didn't scare me.*
> . . .
> Q: So the FBI—you're saying the FBI had her son in custody? That's what they told you?
> A: Yes, sir. That's what this pager say. What he say this pager, he said, "We got the Layla girl in custody and we got the boy." They say, "What you want us to charge Layla Hale with and what you want us to do with this boy?"
> Q: And you said you told them to bring them—
> A: I told them, "If you got Layla Hale, bring her here and let me see her."
> Q: And they didn't have her, did they?
> A: He told me, "We don't have Layla Hale."
> Q: So the big ruse didn't work on you, did it?
> A: *It didn't work.*
> Q: So all of the questions about the ruse are just—
> A: I mean, he was trying to get something that he never had out of me and—
> Q: And it didn't work on you, did it?
> A: *And I never admitted to nothing no way*.

Id. at 61-63, R. Vol. IV (emphasis added). Blue was convicted and timely filed

this appeal.

**DISCUSSION**

Blue argues that the district court erred by admitting his involuntary admissions about the robbery at trial. He asserts that the officers' statements that they were going to arrest and charge Hail were misrepresentations because they had no reason to believe that she was involved in the robbery. Blue also agues that he testified at trial only that he did not believe that Hail was in custody; Blue maintains that he never testified that he disbelieved that Hail would be charged for the firearm.

We review the question of voluntariness de novo. United States v. Muniz, 1 F.3d 1018, 1021 (10th Cir. 1993). We examine the entire record and make an independent determination of voluntariness. United States v. Glover, 104 F.3d 1570, 1579 (10th Cir. 1997). The district court's factual findings underlying a voluntariness determination are reviewed for clear error. Muniz, 1 F.3d at 1021.

In determining whether a particular confession is coerced and therefore involuntary, we consider the following factors: "(1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of her constitutional rights; and (5) whether the defendant was subjected to physical punishment." Glover, 104 F.3d at 1579; see also Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). "The determination of voluntariness is based on the

totality-of-the-circumstances; none of the single factors listed above is determinative." Glover, 104 F.3d at 1579.

"Incriminating statements obtained by government acts, threats, or promises that permit the defendant's will to be overborne run afoul of the Fifth Amendment and are inadmissible at trial as evidence of guilt." Id. Without more, however, misrepresentations, ruses, and trickery by questioning authorities do not render a voluntary confession involuntary. See Frazier v. Cupp, 394 U.S. 731, 739 (1969) (interrogator's misrepresentation to suspect that accomplice had already confessed did not render suspect's confession coerced); United States v. Unser, 165 F.3d 755, 766-67 (10th Cir. 1999) (agents employed a "measure of subterfuge" by inducing defendant to return to their offices when defendant did not know he was the target of a criminal investigation, and defendant believed officers merely wanted to help him retrieve his snowmobiles; nonetheless, defendant's will was not overborne and statements were admissible); Lucero v. Kerby, 133 F.3d 1299, 1311 (10th Cir. 1998) (defendant's inculpatory statements were admissible even though officer falsely told defendant that his fingerprints had been found at the crime scene); but see Rogers v. Richmond, 365 U.S. 534, 539 (1961) (threats to take family members into custody may render voluntary confession involuntary); United States v. Alcarez-Mora, 246 F. Supp. 2d 1146, 1154-55 (D. Kan. 2003) (officer's statement to defendant that if he failed to cooperate he would "never

see his daughters again," in totality of the circumstances, caused confession to be coerced).

Here, it is abundantly clear that Blue's will was not overcome by the "simulated information" ruse. First, there is nothing in the record demonstrating that Blue was susceptible to coercion because of age, inexperience, or lack of intelligence. He is 29 years old, reportedly has a GED, and has experience within the criminal justice system. He was also advised of and waived his Miranda rights. Additionally, the questioning was not unduly long and Blue was not subjected to any sort of physical punishment. Second, and more importantly, according to Blue's own testimony at trial, the "ruse" had no effect on him. He testified repeatedly that the simulated information "did not scare him" and "did not work." Blue therefore never believed that his girlfriend was in custody or was going to be charged with a firearms offense.[4] In fact, at trial, Blue denied admitting anything as a result of Jenkins' misrepresentations. We therefore cannot conclude that Blue was coerced into making the inculpatory statements, and the district court did not err by admitting the statements.

---

[4]Agent Jenkins maintained at trial that officers planned to question Hail about the incident because Blue and Morris were arrested while driving her car, and because it was her coat that was found in the backseat of the car. The "ruse," therefore, was only deceiving to the extent that it suggested that officers were already on their way to question Hail or that Hail was already in custody. Hail was indeed questioned the day after the robbery.

**CONCLUSION**

For the foregoing reasons, we AFFIRM Blue's conviction.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge