**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 10 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

STEVIE JEROME WILLIAMS,

    Defendant - Appellant.

No. 97-6332

(W.D. Oklahoma)

(D.C. No. CR-96-152-M)

---

**ORDER AND JUDGMENT**[*]

---

Before **ANDERSON**, **McKAY**, and **LUCERO**, Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

Stevie Jerome Williams appeals his convictions following a jury trial for bank robbery, attempted bank robbery, being a felon in possession of a firearm,

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

carrying a firearm during a crime of violence, and knowingly transporting a firearm in interstate commerce with intent to commit armed robbery. He contends that the district court erred in finding 1) there was probable cause to arrest him,[1] and 2) his confession was voluntary. We affirm.

## BACKGROUND

On August 27, 1996, Williams flagged down an Altus, Oklahoma, citizen. He asked for directions to the Red River Federal Credit Union, stating that he wanted to "make a loan." R. Vol. III at 163. The citizen gave him the directions, but became alarmed when she observed the outline of a gun in Williams' front pants pocket. Following their conversation, she contacted the sheriff's office to report her suspicion that a man carrying a gun was going to rob the credit union. She described the man as a stocky, bald, black male weighing about 250 pounds. Id. at 162, 167.

The Altus police department immediately dispatched Officer Stephen Sollis to the credit union. Id. at 174-75. As he drove into the parking lot in his police car, Sollis observed Williams approaching the credit union front door and looking over in Sollis' direction. Id. at 176-77. As Sollis watched Williams enter the

---

[1]Although he characterizes his contention in terms of probable cause, Williams' argument actually goes to the investigatory stop and detention. See discussion infra.

building, Sollis noted that he was wearing a floppy blue fishing hat and sunglasses, and that he fit the dispatched description—a black male about six feet tall, weighing approximately 250 pounds. Id. Additionally, Sollis observed a bulge in Williams' right front pocket which was consistent with his information that Williams was carrying a gun. Id. at 179.

Sollis then parked in the nearest space in front of the credit union. As Sollis was getting out of his patrol car, Williams came back out of the credit union "without any commotion or any urgency." Appellant's Br. at 3. Sollis approached him and asked him what he was doing; Williams responded that he was getting a job application. Sollis then asked if he was carrying a gun. When Williams said no, Sollis stated that he would have to frisk him. At that point, Williams admitted he was carrying a gun. Sollis then retrieved a .380 caliber semiautomatic pistol from Williams' pocket and placed him under arrest for carrying a concealed weapon. R. Vol. III at 179-81.

That evening, two FBI agents conducted an interview with Williams. According to Agent Manns' testimony at the suppression hearing, when the agents first entered the room, Williams said, "I know my rights. I have the right to an attorney." Id. at 6. The agents agreed and indicated that they would like to advise him further of his rights, and they did so, following a specific Advice of

Rights form.[2]  Id. at 6-8, 83.  Manns testified that Williams refused to sign the form, but stated that he would answer certain questions.  Id. at 8-9.  Manns further testified that Williams gave no reason for his refusal to sign the form, and Manns specifically stated that, once he was fully informed of his rights, Williams never asked for a lawyer.  Id. at 8, 13.  According to Manns' testimony, after reading the form to Williams and obtaining Williams' response, Agent Damron wrote the following notation on the Advice of Rights form:  "Williams stated he understood his rights and would answer certain questions.  He was assured that he could stop at any question and was free to return to his cell at any time.  He stated he would not sign anything."  Id. at 78.  The form itself provided that "[i]f you decide to answer any questions now without a lawyer present, you will still have the right to stop answering at any time."  Id. at 8, 52.  Both agents signed the form as witnesses.  Id. at 8, 77-78.  The agents did not actually begin their

---

[2]At trial, Agent Damron also testified about the encounter:

I told him that we wanted to visit with him about the circumstances of his arrest.  I explained to him that because he was in custody that it was necessary for me to advise him of certain Constitutional rights.  He immediately said, I know what my rights are.  I have a right to an attorney.  I told him that was true but there were other important rights that I wanted to explain to him so he knew what all of his rights were so he could make a decision as to whether or not he would talk with us.

R. Vol. III at 83.

interrogation until after they had read Williams his rights and obtained his agreement to answer certain questions. Id. at 9.

Although Williams had told the Altus police that his name was Earl Williams, he told the FBI agents that his real name was Stevie Jerome Williams. Williams also told the agents that he was in Altus looking for a job, and that the car he was driving had been rented by his girlfriend, Kathryn Williams, who also owned the gun which he was simply carrying for protection; he also gave the address where they lived in Lubbock, Texas. Id. at 9-11, 79, 89, 96.

When the agents asked him if he had committed any bank robberies, Williams said no. Id. at 12. The agents then showed him a picture taken by a bank security camera, and they asked him if he was the person in the picture. At first Williams became upset and refused to look at the picture, but finally he did look at it, and then he said, no, he was not the person in the picture, although he conceded that the person did look like him. Id. According to Manns, on two occasions during the interview Williams became upset and stated that he did not want to answer any more questions. Id. at 13. On each occasion, the agents told Williams "that was his right" and he was "free to return to his cell," and the agents got up to leave. Id. However, according to Manns, each time that the agents stood up, Williams would stay seated and simply volunteer something else and continue talking, even though the agents had not asked him any further

questions. In each instance, the information that Williams volunteered was insignificant, and the agents felt that the interview "wasn't going anywhere." Id. at 13-14. The entire interview lasted about an hour. Id. at 12, 21.

At the suppression hearing, Williams acknowledged that Agent Damron read him his rights from the form. However, Williams disagreed with Agent Manns' testimony regarding his response: "I told him that I didn't have nothing to say to him. I preferred a lawyer to be present concerning anything that he had to ask me." Id. at 37. "I got upset. I beated on the table. It didn't do no good. I told them to return me to my cell. They disregarded it. They allowed me to sit there. Then they begin to ask me questions concerning bank robberies." Id. at 50-51.

In any event, Williams testified that the next morning he told one of his jailers he wanted to talk to the FBI agents. Id. at 14, 38. The agents returned. Again they advised Williams of his rights, and again he refused to sign the form. In accord with his practice the day before, Agent Damron wrote the following notation on the form: "Stated that he did not want to sign the form but wanted to furnish information. He stated he understood his rights." R. Vol. III at 16, 100.

According to Manns' testimony, Williams told them he had called them back to tell them about some illegal activity he was aware of. Id. at 16. The agents told him that they had no authority to tell him whether any information

could help him, but they would pass it on to the U.S. Attorney's office. Id. at 17, 101. Manns specifically testified that they made no threats or promises.[3] Id. at 16-17.

Williams then told the agents about gambling and drug activity in Texas and Florida. Id. at 17, 39. After he finished telling them about those activities, the agents again discussed the bank robberies with him, id. at 17, which included a discussion about Williams' girlfriend. Id. at 32. Shortly after the interview began, Williams confessed to four bank robberies. Id. at 19-20; 101-03.

At the suppression hearing, Williams admitted he had understood his rights that were read to him from the Advice of Rights forms, and he specifically acknowledged that he understood he could stop answering questions at any time. Id. at 51-52, 49. Additionally, he stated, "I didn't agree to talk to them on the first day. The second day I agreed to talk with them." Id. at 50. However, he claimed that he was coerced into confessing on the second day because the FBI agents threatened to prosecute his girlfriend and promised him lenient treatment. Id. at 41-43, 47. According to Williams' testimony, the agents "got to the point to

---

[3]According to Damron's testimony at trial, Williams said he was offering the information, in the hope that it would help "the situation he was in." R. Vol. III at 101. After Williams finished relating his information, Williams asked about his girlfriend, and the agents advised him that another agent had spoken to her. Id. at 102. Williams indicated that she had not done anything, and the agents told him that they had to investigate anyone who might be involved. Id. At that point, "[Williams] became very quiet. He looked away for several seconds and then he just said, I did it." Id. at 102-03.

as Kathryn being a participant in the bank robbery," and "[i]n some way" the agents were saying "as her being an accomplice to these crimes." Id. at 41-42. Williams also testified that "they gave an impression that that was—uhm a high[er] official than them if I—if I confessed to the crime, that they would be lenient on prosecuting me for the charges that they was charging me with." Id. at 46.

## DISCUSSION

A. The Investigatory Stop

As his first claim of error, Williams contends that neither the overly general description that was dispatched nor his actions which Sollis actually observed were sufficient to support the investigatory stop and detention.

In reviewing the denial of a motion to suppress, we consider the totality of the circumstances in the light most favorable to the government, and we accept the district court's factual findings unless clearly erroneous. United States v. Gutierrez-Daniez, 131 F.3d 939, 940-41 (10th Cir. 1997), cert. denied, No. 97-8044, 1998 WL 86531 (U.S. March 23, 1998). However, the ultimate determination of reasonableness under the Fourth Amendment is a question of law which we review de novo. Id. at 941.

It is well-settled that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Terry v. Ohio, 392 U.S. 1, 22 (1968). Thus, "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989). To justify such an investigative detention, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the particular] intrusion." Terry, 392 U.S. at 21. Additionally, in such cases, a frisk is justified as a means of assuring the officer's safety. Adams v. Williams, 407 U.S. 143, 146 (1972) (citing Terry, 392 U.S. at 30); see also Minnesota v. Dickerson, 508 U.S. 366, 373-74 (1993). In determining whether an investigational detention is reasonable, we examine, first, whether the stop was justified at its inception, and, second, whether the scope of the stop was reasonably related to the circumstances which justified it originally. United States v. Toro-Pelaez, 107 F.3d 819, 824 (10th Cir.) (citing Terry, 392 U.S. at 20), cert. denied, 118 S. Ct. 129 (1997).

In this case, we conclude that the dispatched description was sufficiently detailed to give rise to a reasonable articulable suspicion that Williams was the

person who had been described as carrying a gun possibly for the purpose of robbing the credit union which Sollis observed him entering. Moreover, even if we completely disregarded any inferences regarding Williams' particular purpose, we would still conclude that the stop was reasonable. That is, as the government correctly argues, Sollis observed a bulge which accorded with his information that Williams was armed. Therefore, at the very least, once Williams entered the credit union, Sollis reasonably believed him to be in violation of Oklahoma law respecting the carrying of concealed weapons. See Okla. Stat. Ann. tit. 21, §§ 1290.4, 1290.22; 25 Okla. Op. Atty. Gen. 245 (1996) (noting that § 1290.22, which expressly allows businesses to restrict or prohibit weapons on their premises, constitutes a limitation upon the right to carry a concealed weapon under the Oklahoma Self-Defense Act); R. Vol. III at 207-08.

Accordingly, we agree with the district court's conclusion that the detention was justified, and its scope was appropriate under the circumstances. Thereafter, upon verifying that Williams was, in fact, carrying a concealed weapon, Sollis had probable cause to arrest him on a weapons charge.

B. Waiver of Miranda Rights and the Confession

After hearing the testimony of Williams and the FBI agent, the district court found that, "[w]hile defendant refused to sign the Advice of Rights forms, defendant orally waived his rights." Appellant's Br., App. at 4 (citing North

Carolina v. Butler, 441 U.S. 369, 373 (1979)). The district court further found that "there is simply no evidence to suggest defendant was coerced into making a confession on August 28, 1996. Under the totality of the circumstances, the Court finds defendant's waiver of his Miranda rights was voluntary." Id. Williams contends that the district court erred in concluding that he orally waived his Fifth Amendment rights and in finding that his confession was not coerced. Williams' argument appears to challenge both the district court's findings of facts as well as its legal conclusions.

"The determination of whether a valid waiver of Fifth Amendment rights has occurred is a question of law which we review de novo; subsidiary factual determinations are reviewed under the clearly erroneous standard." United States v. Roman-Zarate, 115 F.3d 778, 782 (10th Cir. 1997). Whether a confession was voluntary also presents a legal question which we review de novo. United States v. Short, 947 F.2d 1445, 1449 (10th Cir. 1991). In making our determination, we review the evidence in the light most favorable to the government, United States v. Robertson, 19 F.3d 1318, 1321 (10th Cir. 1994), and we uphold the district court's factual findings unless they are clearly erroneous. United States v. Glover, 104 F.3d 1570, 1578-79 (10th Cir. 1997).

1. Disputed Facts

As to any critical subsidiary factual findings, our standard of review gives great deference to the district court who observed the witnesses. At the suppression hearing, Williams testified that, in the first interview, he refused to answer any questions without an attorney present, and he claims that he confessed in the second interview because the agents threatened him and promised him leniency. However, the agent testified that once Williams had been fully advised of his rights, he did not request an attorney. According to the agent, Williams agreed to answer the agents' questions in the first interview with the understanding that he could stop at any time, and that, in fact, Williams did stop the questioning on two occasions, although each time he continued volunteering information without further questioning. Additionally, the agent testified that they made no threats or promises in either interview.

Obviously, the court believed the agent's testimony that Williams orally waived his rights as to both interviews, and that the agents made no promises or threats. These are credibility findings, and, taken in the light most favorable to the government, those findings are not clearly erroneous.

2. <u>Voluntariness</u>

Having accepted the district court's finding that Williams did in fact orally waive his Fifth Amendment rights and that the agents neither threatened him nor made any promises, we now consider de novo whether that waiver and the subsequent confession were voluntary.

"If a defendant talks to police after being advised of his right to remain silent, the government bears the burden of proving by a preponderance of the evidence that the waiver of the right was voluntary." <u>Toro-Pelaez</u>, 107 F.3d at 825 (citing <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986)). However, "[a]n express statement of waiver by the defendant is not required; instead, waiver can be inferred from the defendant's actions and words." <u>Id.</u> (citing <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979)). Nonetheless, a defendant's waiver of Fifth Amendment rights can be effective only if the totality of the circumstances surrounding the interrogation shows both an uncoerced choice and the requisite level of comprehension. <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986); <u>United States v. Hernandez</u>, 93 F.3d 1493, 1501 (10th Cir. 1996). Likewise, in determining whether a confession is voluntary, we review the totality of all the surrounding circumstances, including the characteristics of the accused and the tactics employed by the police. <u>Toro-Pelaez</u>, 107 F.3d at 825-26; <u>Glover</u>, 104 F.3d at 1579 (noting important factors such as age, intelligence, and education of

-13-

the defendant; length of the detention; length and nature of questioning; whether a Miranda warning was given; and whether physical punishment was involved) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).

a.  The Waiver

In this case, the totality of the circumstances demonstrates a voluntary waiver of Fifth Amendments rights.[4]  That is, although Williams refused to sign the Advice of Rights forms, he admitted understanding his rights.  Additionally, that he fully appreciated the extent of those rights is demonstrated by the evidence that, in the first interview, he actually did cut off questioning.  Moreover, although he disputed (unsuccessfully) the facts surrounding that first interview, he readily admitted that he initiated the second interview, that the agents read him his rights, that he fully understood those rights, and that he agreed to talk to the agents when they had finished reading him his rights.  See Edwards v. Arizona, 451 U.S. 477, 486 n.9 (1981).  The totality of circumstances in both interviews demonstrates "an uncoerced choice" and "requisite level of comprehension,"

---

[4]We note that the agent testified that, when he and his partner entered the room for the first interview, Williams stated, "I know my rights.  I have the right to an attorney." The district court did not address the significance, if any, of that statement which was made before the agents read Williams his full rights.  However, in its brief to us, the government argues that Williams' initial statement did not constitute an unequivocal request for counsel which would have required the agents to cease questioning. Appellee's Br. at 15-16 (citing Davis v. United States, 512 U.S. 452, 459 (1994)).  We need not reach this argument, since subsequent circumstances demonstrate a voluntary waiver in any event.  See discussion and note 5 infra.

sufficient to find, by a preponderance of the evidence, that Williams voluntarily waived his rights and agreed to talk to the agents.[5]

### b. The Confession

A defendant's confession is involuntary "if the government's conduct causes the defendant's will to be overborne and 'his capacity for self-determination critically impaired'." United States v. McCullah, 76 F.3d 1087, 1101 (10th Cir. 1996) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1937)).

The FBI agents testified they told Williams that his girlfriend, who had rented the car he drove and who owned the gun he carried, would be the subject of further investigation as a potential witness or accomplice. Additionally, they testified that they advised Williams they would pass on any information regarding his cooperation. Williams contends that the statements about his girlfriend coerced him into confessing, and he also argues that promises of leniency rendered his confession involuntary. In its brief to us, the government responds that neither the statements related to Williams' girlfriend, nor the statements

---

[5]Furthermore, even if Williams' original waiver and agreement to the first interview were conditional and limited, once he summoned the agents back for the second interview, "nothing in the Fifth and Fourteenth Amendments would prohibit the [agents] from merely listening to his voluntary, volunteered statements and using them against him at the trial." Edwards, 451 U.S. at 485; accord Roman-Zarate, 115 F.3d at 782; Glover, 104 F.3d at 1581.

about possible benefits of cooperation, constitute improper or coercive conduct. We agree.

Even if Williams' confession was motivated by a desire to spare his girlfriend from an investigation and its possible consequences, such motivation does not render the confession involuntary.[6] See Glover, 104 F.3d at 1580 (considering a defendant's desire to help a co-defendant, and finding that "[t]hese types of personal psychological pressures do not amount to official coercion rendering a confession involuntary"); see also United States v. Westbrook, 125 F.3d 996, 1006 (7th Cir.) (holding that agent's suggestion that defendant's cooperation would help defendant's wife did not constitute undue coercion), cert. denied, 118 S. Ct. 643 (1997); Allen v. McCotter, 804 F.2d 1362, 1364 (5th Cir. 1986) (holding that defendant's confession was "not involuntary by reason of his desire to extricate his wife from a possible good faith arrest"). Furthermore, the fact that agents state in general that cooperation may have benefits does not compel a finding that a defendant's statement is involuntary. See Roman-Zarate, 115 F.3d at 782; Glover, 104 F.3d at 1582.

---

[6]We readily distinguish this case from the situation in Harris v. South Carolina, 338 U.S. 68, 69-70 (1949), in which the defendant, an illiterate, was questioned in relays for up to twelve-hour periods over two days in a hot cubicle, without ever being advised of his rights, and finally confessed when threatened with the arrest of his mother on unrelated charges.

In assessing the voluntariness of a confession, we consider all the circumstances, including the following factors in this case:  Williams was advised of his Miranda rights, the length of the interview was short, and no physical punishment or improper threats were involved.  Based on our review of the entire record and the totality of the circumstances, we conclude that the district court did not err in finding that Williams' confession was voluntary.

AFFIRMED.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge