**UNITED STATES of America, Plaintiff,**

v.

**Randy C. WOOD, and Jerry R. Hammond, Defendants.**

**No. 97–40086–01/02–SAC.**

United States District Court, D. Kansas.

May 4, 1998.

---

Marilyn M. Trubey, David J. Phillips, Office of Federal Public Defender, Topeka, KS, for Randy C. Wood, Defendant.

Randy C. Wood, Topeka, pro se.

Michael M. Jackson, Topeka, KS, Jerry R. Hammond, Hollister, MO, for Jerry R. Hammond, Defendant.

Randy M. Hendershot, Office of United States Attorney, Topeka, KS, for U.S.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The case comes before the court on the defendants' pretrial motions. The defendant Randy Wood has filed: Motion to Suppress Evidence (Dk.31); Motion for Disclosure of 404(b) Evidence (Dk.32); and Motion to Join the Co–Defendant's Motions (Dk.33). The defendant Jerry Hammond has filed: Motion to Adopt and Join in Pretrial Motions of Co–Defendant (Dk.35); Motion to Suppress Evi-

dence (Dk.36); Motion to Dismiss Count II (Dk.37); Motion to Suppress Defendant's Statements (Dk.38); and Request for Notice Pursuant to Rule 404(b) (Dk.39). The parties presented oral arguments and evidence at a hearing on January 26, 1998, and at a continuation of the hearing on February 5, 1998. The court gave the defendant Hammond additional time to file a supplemental memorandum. The defendant timely submitted a memorandum totaling twenty-six pages to supplement his original five-page motion and memorandum. (Dk.54). Having received and reviewed all matters presented by the parties and having researched the controlling law, the court issues this order as its ruling on the above motions.

## INDICTMENT

On October 22, 1997, the grand jury returned a four-count indictment against the defendants for conduct occurring on or about December 16, 1996. Count one charges both defendants with conspiracy to possess with the intent to distribute in excess of 175 grams of methamphetamine in violation of 21 U.S.C. § 846. Count two charges both defendants with attempting to possess with the intent to distribute in excess of 175 grams of methamphetamine in violation of 21 U.S.C. §§ 846 and 841(a)(1). Count three charges both defendants with using a facility in interstate commerce with the intent to carry on or facilitate the unlawful activity of possessing methamphetamine with the intent to distribute in violation of 18 U.S.C. § 1952. Count four charges the defendant Randy C. Wood with possession of a shotgun which has a barrel less than 18 inches in length and which is not registered to him in violation of 26 U.S.C. § 5861(d).

## RULE 404(b) REQUESTS (Dks. 32 and 39).

Both defendants request notice of evidence that the government intends to introduce against them pursuant to Fed.R.Evid. Rule 404(b). The government responds that it will introduce all factual matters already disclosed in discovery. With respect to the defendant Wood, the government further represents that it considers all material provided in discovery to be intrinsic evidence. With respect to the defendant Hammond, the government further represents that it will provide advance notice of any new 404(b) evidence that was not revealed in the original discovery. At the hearing, both defendants conceded that the government's response satisfies the notice requirements of Rule 404(b). The court reminds the government of its continuing duty to comply with these requirements. The defendants' 404(b) request is denied as moot.

## MOTIONS TO JOIN (Dks. 33 and 35).

The court grants these motions upon the express conditions stated in the court's *Criminal Procedural Guidelines,* ¶ I. C. .,

## MOTION TO DISMISS (Dk.37).

The defendant Hammond moves to dismiss count two, that charges him with attempting to possess with the intent to distribute in excess of 175 grams of methamphetamine in violation of 21 U.S.C. §§ 846 and 841(a)(1). The defendant argues that an overt act is an essential element to this offense and that count two fails to allege an overt act. The government responds as follows:

> Counsel's motion might have some theoretical merit if this were a conspiracy case under 18 U.S.C. § 371, but this is a drug conspiracy case, and there is no need for the government to allege an overt act, since there is no overt act necessary for the completion of this crime. *United States v. Shabani,* 513 U.S. 10, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994); *United States v. Williamson,* 53 F.3d 1500 (10th Cir. 1995); *United States v. Johnson,* 42 F.3d 1312 (10th Cir.1994); *United States v. Savaiano,* 843 F.2d 1280, 1284 (10th Cir. 1988).

(Dk.47, p. 1). Because count two does not charge a drug conspiracy, the court does not understand the government's response.

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires an indictment to be "a plain, concise and definite written statement of the essential facts constituting the offense charged." "An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables a defendant to assert a double jeopardy defense." *United States v. Dashney,* 117 F.3d 1197, 1205 (10th Cir. 1997); *see United States v. Poole,* 929 F.2d

1476, 1479 (10th Cir.1991). The sufficiency of the indictment is not a question of "whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged." *United States v. Debrow,* 346 U.S. 374, 376, 74 S.Ct. 113, 98 L.Ed. 92, (1953) (citations omitted). When challenged as lacking an element of the offense, the indictment is sufficient if there are "words of similar import" to the missing element. *Dashney,* 117 F.3d at 1205. In the Tenth Circuit, it is usually enough for the indictment to track the statute when the statute adequately expresses all of the elements to the offense. *United States v. Dunn,* 841 F.2d 1026, 1029 (10th Cir.1988). An indictment is held only to minimal constitutional standards. *United States v. Edmonson,* 962 F.2d 1535, 1541 (10th Cir.1992). Practical rather than technical considerations guide the court in determining the sufficiency of an indictment. *United States v. Bolton,* 68 F.3d 396, 400 (10th Cir.1995), *cert. denied,* 516 U.S. 1137, 116 S.Ct. 966, 133 L.Ed.2d 887 (1996).

■ An act or omission that amounts to a substantial step taken toward the commission of the substantive offense is an essential element to a crime of attempt. *United States v. DeSantiago–Flores,* 107 F.3d 1472, 1478 (10th Cir.1997), *overruled on other grounds, United States v. Holland,* 116 F.3d 1353 (10th Cir.1997). The Tenth Circuit recently set out the following statement of law on this element:

> The "substantial step" required to establish an attempt must be something beyond mere preparation. It must be an act "adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime." *United States v. Monholland,* 607 F.2d 1311, 1318 (10th Cir.1979). A substantial step is an "appreciable fragment" of a crime and an action of "such substantiality that, unless frustrated, the crime would have occurred." *United States v. Buffington,* 815 F.2d 1292, 1303 (9th Cir.1987). The step must be "strongly corroborative of the firmness of the defendant's criminal intent," *United States v. Mandujano,* 499 F.2d 370, 376 (5th Cir. 1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975), and must un-

equivocally mark the defendant's acts as criminal, *United States v. McDowell,* 705 F.2d 426, 428 (11th Cir.1983). *See also Fryer v. Nix,* 775 F.2d 979, 993 (8th Cir. 1985). It should "evidence commitment to the criminal venture." *United States v. Oviedo,* 525 F.2d 881, 885 (5th Cir.1976). However, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

> The dividing line between preparation and attempt is not clear and depends on a high degree on the surrounding factual circumstances. *United States v. Neal,* 78 F.3d 901, 906 (4th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 152, 136 L.Ed.2d 97 (1996).

*DeSantiago–Flores,* 107 F.3d at 1478–79.

■ It is true that count four of the indictment does not expressly allege and identify any act as being the substantial step. Count four, however, suffices in putting the defendant on fair notice of the charge against which he must defend and in enabling the defendant to assert double jeopardy in subsequent prosecutions. As far as sufficiently alleging the elements of the crime of attempted possession of a controlled substance with the intent to distribute, count two tracks the language of §§ 846 and 841(a)(1), and such language is generally enough.

In *United States v. Bolden,* No. 95–40062–SAC, 1995 WL 783638, at *2 (D.Kan. Dec.20, 1995), the court overruled a similar challenge to a count charging attempted bank robbery which purportedly failed to allege the element of a substantial step. The court held, in part:

> "[F]or indictment purposes, use of the word 'attempt' is sufficient to incorporate the substantial step element. The word 'attempt' necessarily means taking a substantial step." *United States v. Toma,* No. 94–CR–333, 1995 WL 65031, at *1, 1995 U.S. Dist. LEXIS 1778, at *5 (N.D.Ill. Feb.

10, 1995) (footnote omitted). Rule 31(c) of the Federal Rules of Criminal Procedure allows a conviction for "an attempt to commit the offense charged." If a defendant could be found guilty of attempted bank robbery when the indictment fails to allege a substantial step or to even mention "attempt to take," it is incongruous to hold that another defendant is entitled to dis-missal because the indictment charges the attempt language without a substantial step allegation. *United States v. Toma,* 1995 WL 65031, at *2, 1995 U.S. Dist. LEXIS 1778, at *5–*6.

The court in *Bolden* also recognized that the count charging attempt also alleged that the defendant assaulted others with a handgun and that this alleged act arguably would amount to a substantial step.

Except for reading "attempt" as necessarily meaning "substantial step," count two in this case does not plainly state any act or omission as constituting the substantial step element. Frankly, the court is at a loss to tell from the indictment what essential facts, in the government's opinion, amount to the substantial step. While the court believes that the word "attempt" is sufficient for Rule 7(c) purposes, the court orders the government to produce a bill of particulars on this count within five days of this order. The court denies the motion to dismiss on the condition that the government produce a bill of particulars within twenty days of this order.

## MOTIONS TO SUPPRESS (Dks. 31, 36 and 38).

The defendants move to suppress all items seized in the search of the package conducted on December 13, 1996, and in the searches conducted on December 16, 1996. The defendant Hammond also moves to suppress his statements as involuntary and as the product of unlawful searches and a prior *Miranda* violation.

## A. FACTS

 Based on the evidentiary hearing and the credible affidavits [1] supporting the warrants, the court finds the relevant facts to be as follows. On December 13, 1996, around 6:00 p.m., Detective Carlos Benavidez with the Police Department of Tempe, Arizona, was randomly checking outgoing Federal Express Parcels at 2405 W. University Drive, Tempe, Arizona. The Detective observed a brown cardboard box measuring 9½″ × 5″ × 12½″ with a shipping order on top. The order reflected that the sender was "Jake Thompson" having an address of 720 W. 5th St. # B, Tempe, AZ 85280 and a phone number of (602) 350–9687. The order identified the addressee only as "Bones" with an address of 1156 Jewell, Topeka KS 66604. The Detective next noticed that the sender had paid $38.25 in cash to ship the package. The Detective's experience had been that suspects mailing controlled substances often paid with cash to prevent officers from following any paper trial in the event the drugs were detected. From looking at the order, Detective Benavidez also observed that the zip code was incorrect for the location of the sender's address.

Detective Benavidez called the phone number given by the sender. The person answering the call said the number belonged to a business and that there was no one at that address with the name of Jake Thompson. The Detective next contacted local directory assistance for the telephone number of a Jake Thompson living at 720 5th St. # B. The Detective learned that there was no listing for a Jake Thompson in the area. The Detective checked the zip code on the sender's address and found that it was used for post office boxes. The Tempe Police Dispatch informed Detective Benavidez that the address, 720 W. 5th St. # B did not exist. Detective Benavidez prepared an affidavit setting out the above facts and further stat-

---

**1.** In suppression hearings, the court is not bound by the Federal Rules of Evidence except those governing privileges. *United States v. Matlock,* 415 U.S. 164, 172–74, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Thus, "affidavits and unsworn documents that bear indicia of reliability" may be received and considered at suppression hearings. *United States v. Schaefer,* 87 F.3d 562, 570 (1st Cir.1996). The judge hearing the suppression motion may accept hearsay evidence if satisfied there is no serious reason to doubt that the out-of-court statement was made and that the statement is true. *See United States v. Maza,* 93 F.3d 1390, 1396 (8th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1008, 136 L.Ed.2d 886 (1997); *United States v. Merritt,* 695 F.2d 1263, 1270 (10th Cir.1982), *cert. denied,* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983).

ing it had been his experience "that suspects attempting to ship illegal drugs through delivery services also use fictitious addresses for themselves in the event that the package is discovered by law enforcement."

Finding probable cause based on the Detective Benavidez's affidavit, the magistrate judge issued a search warrant for the package. As told to Detective Sergeant Randall Listrom of the Topeka Police Department, Detective Benavidez opened the package and found two pounds of a substance that he identified as methamphetamine. Detective Benavidez telephoned the Topeka Police Department and arranged for the package to be shipped Federal Express to Detective Listrom. On December 16, 1996, Detective Listrom went to the Federal Express office in Topeka and took possession of the package delivered from Tempe, Arizona. At that time, Detective Listrom prepared an affidavit disclosing his telephone conversation with Detective Benavidez and attaching Benavidez's affidavit and the search warrant issued in Arizona. The District Court of Shawnee County, Kansas, issued a search warrant for the package at 8:46 a.m. on December 16, 1996.

Detective Listrom searched the package and confirmed that the contents appeared to be methamphetamine. Officers immediately attempted a controlled delivery of the package to 1156 S.W. Jewell, but no one answered the door. Detective Listrom then prepared an affidavit and obtained a warrant at 10:22 a.m. on December 16, 1996, to search the residence at 1156 S.W. Jewell for evidence of the use or sale of methamphetamine, of the persons residing at that location, and of contact with persons at the area code (602) for Arizona. Officers executed this warrant and seized bills, a tape from an answering machine, documents showing names and addresses, and letters from Jerry Hammond to Diane Burt. In particular, they found a note with "Cindy" and a area code 602 phone number.

Learning that Diane Burt resided at 1156 S.W. Jewell, Detective Listrom went to Burt's place of employment and spoke with her. She agreed to go to the police station and talk with Detective Listrom. Burt disclosed that she had been living with Jerry Hammond and that Hammond had a brother named Randy Wood who resided with Melanie Griffin at 2626 S.E. 45th Street. Burt also said that Hammond had been by her house on Saturday to pick up a package and that he had called his brother and told him that the package had not arrived. Burt told Listrom that Wood was unemployed but had been making monthly trips to Arizona returning a few days later by plane. Wood explained the trips were visits to his sister, Cindy. Burt further advised that within the last two months Wood and Hammond had accepted delivery of a package sent to her home that was addressed to "Bones." Wood explained that the package was a Christmas gift for his girlfriend, Melanie. Burt further told Listrom that Wood had several weapons, including handguns and rifles.

Officers picked up Melanie Griffin who told officers that she and her boyfriend, Randy Wood, used methamphetamine. She said that several months ago a package arrived that was addressed to one of her children. She allowed her child to open the package which contained a large amount of white powder that Griffin recognized as methamphetamine. Upset with Wood, Griffin instructed him not to have any such items shipped to their residence. Griffin said that Wood did make a trip to Arizona from which she believes he obtained a large amount of methamphetamine. Griffin also disclosed that she knew a security guard at Topeka State Hospital was stealing computers from the grounds and trading them for methamphetamine from Wood.

Officers next located Jerry Hammond at 2021 S.E. Washington along with Shirley Kuhn. Officers Charles Bohlender and Brian Hill were sent to this address. Hammond answered the door and invited the officers in after they identified themselves. The officers asked if there was anyone else in the residence and then officer Bohlender conducted a protective sweep of the residence. Officer Hill informed Hammond that they were investigating a package of methamphetamine and proceeded to ask Hammond if he went by any nicknames. Hammond said he was sometimes called, "Bones" or "Grasshopper." Without pulling his weapon or using his handcuffs, Officer Hill told Hammond

that he was under arrest and asked if Hammond wanted to be interviewed at the police station. Hammond said that he was willing to be interviewed but that he needed to change clothes. Officer Hill followed Hammond to another room. While Hammond was putting on his shoes, he looked up at officer Hill and asked, "Do you guys have the meth?" At that point, officer Hill stopped Hammond and informed him of his Miranda rights. Hammond said he understood his rights and did not indicate that he wanted an attorney or that he did not want to speak with Hill.

Kuhn consented to officers searching her residence. Officer Bohlender found in the upstairs a green, military-style, foot locker in the attic. All four persons went upstairs to look at the foot locker. Hammond told officers that the locker belonged to Wood. Kuhn told officers that they could take the foot locker if they wanted it. Officers later took Hammond to the station where his interview with Officer Hill was videotaped. The recording of this interview was admitted into evidence. The court has viewed the videotape in chambers.

At 2:07 p.m. on December 16, 1997, Detective Listrom received a warrant to search the residence at 2626 S.E. 45th for the same or similar items described in the prior warrant for 1156 S.W. Jewell. Officers executed this warrant seizing various items including camera, scales, currency, packaging material, a vial containing what appeared to be methamphetamine, pager, letters and photographs. During the execution of the first warrant, officers also observed guns and computer equipment. One of the computers had a State of Kansas ownership sticker on it. Officers obtained a second warrant that included firearms and computer equipment in the list of items to seize. Officers also obtained a warrant to search the footlocker at 7:15 p.m. on December 16, 1996. Officers found airline tickets, various drug paraphernalia, and drug residue in the locker.

## B. SEARCH OF THE PACKAGE

The defendants argue they have standing to challenge the search warrant issued in Arizona as facially invalid. They argue first that the Tempe police dispatcher erroneously informed Detective Benavidez that 720 W. 5th St., # B, was not a valid, existing address in Tempe. At the hearing, the government conceded that this address exists in Tempe, Arizona. The defendants conclude that the facts disclosed in Detective Benavidez's affidavit are not sufficient for a finding of probable cause and that no officer could have reasonably believed in the existence of probable cause based on those averred facts.

At the hearing, the government stipulated that Hammond has standing to challenge the search of the package.[2] The government, however, contests Wood's standing because he was neither the sender nor the addressee. The government insists the facts found in Detective Benavidez's affidavit, excluding the erroneous information from the dispatcher, are sufficient for a probable cause finding. Alternatively, the government argues that Detective Benavidez reasonably relied in good faith on the warrant.

### 1. Standing

The government argues that Wood lacks standing as he is not named as either the sender or the addressee on the package. Woods insists he has standing based on the governments' belief that he ultimately would receive the contents of the package. As proof, the defendant introduces two police reports, defendant's exhibits W-1 and W-2, which contain the hearsay statements of Diane M. Childs Burt and Jerry Hammond respectively. As found on exhibit W-1, Burt told officers that Hammond had been at her place for most of Saturday and had telephoned someone whom Burt assumed was Wood. Burt overheard Hammond say that the package had not arrived and that he was not waiting all day for it. Burt also told officers that within the last two months another package addressed to "Bones" had been delivered to her place and that Wood was there when it arrived. At that time, Wood told Burt it was a Christmas gift for his girlfriend and then he and Hammond took the package to another room and

**2.** The government explained that its stipulation was based on its investigation and Hammond's admission that his family nickname was "Bones" and that he was the addressee on the package.

wrapped it again. As recorded on exhibit W–2, Hammond told Officer Brian Hill that Wood was receiving the packages. Hammond explained that Wood would inform Hammond when to expect a package and that when it arrived then Hammond would take it to Wood or call Wood. Hammond said he received some of the methamphetamine for receiving the package.

■ The defendant has the burden of proving standing and a prima facie Fourth Amendment violation. *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir.1994) (The defendant "bears the burden of proving whether and when the Fourth Amendment was implicated."); *see United States v. Poulsen*, 41 F.3d 1330, 1335 (9th Cir.1994) (the defendant has the burden of establishing her standing to assert a Fourth Amendment violation); *United States v. Singleton*, 922 F.Supp. 1522, 1527 (D.Kan.1996). "Reliance on vague, conclusory allegations is insufficient." *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir.1992).

■ "The Fourth Amendment protects citizens from unreasonable searches and seizures by government actors." *United States v. Smythe*, 84 F.3d 1240, 1242 (10th Cir.1996) (citing *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048 (1921)). The protection from unreasonable searches and seizures afforded by the Fourth Amendment reaches only places and interests in which the defendant has a reasonable expectation of privacy. *Rakas v. Illinois*, 439 U.S. 128, 140–45, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). "[T]he demonstration of a legitimate expectation of privacy 'is a threshold standing requirement, and analysis cannot proceed further without its establishment.'" *United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir.1993) (quoting *United States v. Cruz Jimenez*, 894 F.2d 1, 5 (1st Cir.1990)).

■ "Fourth [A]mendment rights are personal and cannot be asserted vicariously." *United States v. Arango*, 912 F.2d 441, 445 (10th Cir.1990), *cert. denied*, 499 U.S. 924, 111 S.Ct. 1318, 113 L.Ed.2d 251 (1991). Two inquires are made in deciding whether a person's Fourth Amendment rights were violated. First, did the defendant establish a subjective expectation of privacy in the property to be searched? Second, would society recognize his subjective expectation as objectively reasonable? *See Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *United States v. Benitez–Arreguin*, 973 F.2d 823, 827 (10th Cir.1992). Concepts of real or personal property law are relevant considerations, but "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." *Rakas v. Illinois*, 439 U.S. 128, 143 & n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Ownership is a relevant factor, but "property rights are neither the beginning nor the end of" the inquiry. *United States v. Salvucci*, 448 U.S. 83, 91, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). "Although neither ownership nor lawful possession are determinative, they are often dispositive factors." *United States v. Arango*, 912 F.2d at 445.

In support of his asserted standing, Wood cites *Arkansas v. Sanders*, 442 U.S. 753, 761 n. 8, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), and *United States v. Villarreal*, 963 F.2d 770 (5th Cir.1992). In *Arkansas v. Sanders*, 442 U.S. at 761, 99 S.Ct. 2586, the defendant conceded ownership of the suitcase; thus, there was no issue over standing. The record here lacks any such stipulation or admission from Wood. In *Villarreal*, the item was shipped to a fictitious person that could have been the alter ego of either defendant according to the evidence. The Fifth Circuit noted that it had "made clear that individuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names." *United States v. Villarreal*, 963 F.2d at 774 (citing *United States v. Richards*, 638 F.2d 765, 770 (5th Cir.), *cert. denied*, 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981), and *United States v. Pierce*, 959 F.2d 1297, 1303 n. 11 (5th Cir.), *cert. denied*, 506 U.S. 1007, 113 S.Ct. 621, 121 L.Ed.2d 554 (1992)[3]). The package of meth-

---

**3.** In *United States v. Richards,* 638 F.2d 765, 770 (5th Cir.1981), the court found standing because the package was addressed to a fictitious person and was in the defendant's possession when seized. In *United States v. Pierce,* 959 F.2d 1297, 1303 (5th Cir.1992), the court denied standing to the defendant who was neither the sender nor the addressee when the package was addressed to an actual person and not to a fictitious entity or the defendant's alter ego.

amphetamine here was not addressed to Wood, to a fictitious person, or to Wood's alter ego. It was addressed to an actual third party, "Bones," which was one of Jerry Hammond's nicknames, and to a location where Hammond lived occasionally with his girlfriend.

■ Generally, a defendant who is neither the sender nor the addressee lacks a privacy right in the package and, thus, has no standing to make a Fourth Amendment challenge. *United States v. Pierce*, 959 F.2d at 1303; *United States v. Koenig*, 856 F.2d 843, 846 (7th Cir.1988); *see United States v. Smith*, 39 F.3d 1143, 1145 (11th Cir.1994); *United States v. Daniel*, 982 F.2d 146, 149 (5th Cir.1993); *United States v. Givens*, 733 F.2d 339, 341 (4th Cir.1984). If addressed to a fictitious name that is the alter ego of the defendant and that establishes the defendant as the immediate recipient of the package, then the defendant has standing. *United States v. Villarreal*, 963 F.2d at 774. If addressed to an actual third party, then the defendant may not have a legitimate expectation of privacy in the package even if he was the intended recipient. *United States v. Pierce*, 959 F.2d at 1303 (defendant never proved an ownership interest in contents); *United States v. Koenig*, 856 F.2d at 846 (defendant never asserted but denied any interest, title or control over drugs being shipped to third party). In *United States v. Givens*, the defendants argued they were the intended recipients of cocaine addressed to a third party and that the third party was acting as an intermediary, and the Fourth Circuit held:

> As to the former argument, defendants cite no direct authority for the proposition that when A sends a package to B, the contents of which are ultimately intended for C that C is entitled to claim a privacy interest in the contents of the package. Nor do we think this argument is tenable on its merits. Even assuming that defendants had some possessory interest in the cocaine, for which they had apparently not yet paid, that interest did not broaden to encompass the mailing envelope and cassette. This situation is analogous to claims that one has a legitimate expectation of privacy in the trunk of another's car, (citation omitted), or in another's purse, (citation omitted). In all these circumstances the owner of the container controls the use of and access to the area as a depository for the property of others; as the Supreme Court in *Rakas*, the right to exclude others affords a significant indicator of whether one has a legitimate expectation of privacy in an area.

733 F.2d at 342 (cocaine was hidden within a cassette tape that was mailed to "Midwest Corporation" to the attention of the intermediary, and Midwest's president authorized the police to open the mailing envelope). Finally, in *United States v. Smith*, a letter containing LSD was mailed to an actual third person who had agreed to give the letter to the defendant. At the suppression hearing, the defendant testified that he was expecting cash from the sender, that he had arranged for the letter to be sent to a third party, but that the third person did not have permission to open the letter. "On cross-examination, Smith equivocally testified regarding his ownership interest in the letter." 39 F.3d at 1144.

■ The court finds that the defendant Wood has not proved a legitimate expectation of privacy in the package. He was not the sender or the addressee named on the package. The name of the addressee was not Wood's fictitious name or his alter ego. In fact, it was the name of an actual person who occasionally lived at the address on the package or who, at least, dated the woman who lived there. Wood did not live at that address and apparently did not have any authority over who actually lived there. The evidence is, at best, equivocal on Wood having an ownership interest in the contents of this package. Wood himself does not admit any ownership interest in the package or any ability to control the package once it arrived at Burt's home. Based on the highlighted statements made by Burt and Hammond, it is unclear that Wood actually owned the methamphetamine. Neither Burt nor Hammond said anything about the methamphetamine being owned by Wood. The fact that upon the arrival of the package Hammond either contacted Wood or delivered the package to him does not prove that Wood owned the methamphetamine. Indeed, Wood may have been just a courier to someone who

actually owned the methamphetamine. As far as Wood having a possessory interest in the methamphetamine, this interest did not arise until after Hammond had taken possession of it and contacted Wood. As revealed in Hammond's conversation with Wood on Saturday, Wood distanced himself from the delivery of the package. There is no evidence that Wood had taken any measures to exclude Hammond, his girlfriend, or anyone else at Burt's residence from opening the package. From a societal perspective, Wood opted to conceal any purported interest in the package and consciously avoided any public announcement that he had a subjective expectation of privacy in the package. Thus, Wood effectively repudiated his connection to the package and lost the means to exclude others from intruding upon his interest.[4] See United States v. DiMaggio, 744 F.Supp. 43, 46 (N.D.N.Y.1990). Given the equivocal evidence concerning Wood's ownership of the methamphetamine and the conditional nature of any possessory interest in it, the court finds that Wood's evidence does not establish any legitimate, personal expectation of privacy in the package.

### 2. Initial Seizure

In their original motion and memorandum, the defendants offered only two sentences of argument on this issue. The defendants questioned Detective Benavidez's authority for being present at the Federal Express facility and the method of his "random" inspection and reserved their right to supplement their argument "upon receipt of additional information." (Dk.34, p. 1). Even though Detective Benavidez did not testify at the evidentiary hearing and no additional information was submitted on this subject, the defendant Hammond in his supplemental memorandum now devotes over eight pages to this issue.

On this issue, the defendants have not made out a prima facie case of a Fourth Amendment violation. Namely, the defendants have not shown that the package was unconstitutionally seized before the warrant was obtained and executed. Detective Bena-

videz averred that he was "randomly checking outbound packages." There is nothing of record to show what the detective actually did with the package while he gathered information for his affidavit and then obtained the search warrant. The defendants assume that Benavidez "temporarily detained it for investigative purposes" and thus "seized" it.

 For purposes of the Fourth Amendment, property is seized "when there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Tangible property is seized when a police officer exercises control over the property by removing it from an individual's possession, United States v. Place, 462 U.S. 696, 707–708, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), or when an officer informs an individual that he is going to take his property, id. at 707, 103 S.Ct. 2637. On the other hand, no seizure occurs when an officer merely picks up an individual's property to look at it, because this interference with the individual's possessory interest is not meaningful. See Arizona v. Hicks, 480 U.S. 321, 324, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); New York v. Class, 475 U.S. 106, 114, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986). Nor does a seizure occur when baggage is temporarily removed from one public area to another without causing any delay in travel plans. United States v. Harvey, 961 F.2d 1361, 1363–64 (8th Cir.), cert. denied, 506 U.S. 883, 113 S.Ct. 238, 121 L.Ed.2d 173 (1992).

 It would appear from the record that while this mailed package was in transit, "the only possessory interest at stake ... was the contract-based expectancy that the package would be delivered to the designated address," within some promised or reasonably expected period of time. United States v. LaFrance, 879 F.2d 1, 7 (1st Cir.1989). Consequently, if Detective Benavidez's assumed detention of the package for investigative purposes did not delay the likelihood or probability of its timely delivery, then there was

---

**4.** Moreover, society is not prepared to recognize an expectation of privacy as reasonable when the individual· chooses not to manifest his expectation of privacy in a manner that society recog-

nizes appropriate for that context. See United States v. DiMaggio, 744 F.Supp. 43, 46 (N.D.N.Y. 1990).

no meaningful interference with the individual's possessory interest in it. *See United States v. England,* 971 F.2d 419, 421 (9th Cir.1992); *United States v. LaFrance,* 879 F.2d at 7; *United States v. Valenzuela–Varela,* 972 F.Supp. 1308, 1311 (D.Mont.1997). There is simply no evidence of record from which the court can determine whether Detective Benavidez's handling of the package delayed its departure from the Federal Express site in Tempe, Arizona.

■ Assuming for the sake of argument that Detective Benavidez did temporarily detain the package for investigative purposes, the court finds that he had reasonable suspicion of criminal activity. The package here matched several factors of a profile developed to identify narcotics packages. Specifically, the label or air bill was handwritten, (Dk.36, attachment), the package was going from an individual to an individual, the sender's zip code was incorrect for the address, and the addressee had an unusual name. *See United States v. Scarborough,* 128 F.3d 1373, 1378 (10th Cir.1997); *United States v. Cantrall,* 762 F.Supp. 875, 879 (D.Kan.1991). In addition, the sender paid cash to ship the package. Based on all of these factors, Detective Benavidez had reasonable suspicion to detain the package for investigative purposes.

### 3. *Good Faith*

In *United States v. Leon,* 468 U.S. 897, 925, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court held that reviewing courts may "reject suppression motions posing no important Fourth Amendment questions by turning immediately to a consideration of the officers' good faith." The court believes the circumstances of this case qualify for jumping ahead to the good faith exception. Therefore, the court will assume without holding that the affidavit fails to establish probable cause and will proceed with deciding whether Detective Benavidez's reliance on the warrant falls within the good faith exception.

■ The Supreme Court in *Leon* pronounced "that suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." 468 U.S. at 918, 104 S.Ct. 3405. "The engine that drives Fourth Amendment protection is prevention and deterrence." *United States v. McCarty,* 82 F.3d 943, 949 (10th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 257, 136 L.Ed.2d 183 (1996). Thus, "where the officer's conduct is objectively reasonable," that is, the officer acts with "objective good faith" in obtaining the warrant from a magistrate and in executing the warrant within its scope, "there is no police illegality and thus nothing to deter." *United States v. Leon,* 468 U.S. 919–21, 104 S.Ct. 3405. It is the "magistrate's responsibility to determine whether the officer's allegations establish probable cause." 468 U.S. at 921, 104 S.Ct. 3405. "In the ordinary case, the officer cannot be expected to question the magistrate's probable-cause determination." *Id.* Indeed, there is a " 'presumption [5] created in *Leon* that when officer relies upon a warrant, the officer is acting in good faith.' " *United States v. McKneely,* 6 F.3d 1447, 1454 (10th Cir.1993) (quoting *United States v. Cardall,* 773 F.2d 1128, 1133 (10th Cir.1985)).

In applying the *Leon* exception, the court must understand that the:

" 'good faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known the search was illegal despite the magistrate's authorization.' ., . To answer this 'objectively ascertainable question,' we are to consider 'all of the circumstances,' and assume that the executing 'officers have a reasonable knowledge of what the law prohibits.' "

*United States v. Dahlman,* 13 F.3d 1391, 1397 (10th Cir.1993) (quoting *United States v. Leary,* 846 F.2d 592, 607 (10th Cir.1988) (quoting in turn *United States v. Leon,* 468 U.S. at 919, 104 S.Ct. 3405)), *cert. denied,* 511 U.S. 1045, 114 S.Ct. 1575, 128 L.Ed.2d 218 (1994). "[T]he reviewing court must examine 'the text of the warrant and the affidavit to

---

**5.** It is not an absolute presumption, but one that carries " 'some weight.' " *United States v. McKneely,* 6 F.3d 1447, 1454 (10th Cir.1993)

(quoting *United States v. Cardall,* 773 F.2d 1128, 1133 (10th Cir.1985)).

ascertain whether the agents might have reasonably presumed it to be valid.'" *United States v. McKneely,* 6 F.3d at 1454 (quoting *United States v. Corral–Corral,* 899 F.2d 927, 932 (10th Cir.1990)). The determination is not just whether the affidavits contain legally sufficient facts but whether the affidavits are devoid of factual support. *United States v. Cardall,* 773 F.2d at 1133. "Thus, 'it is only when [an officer's] reliance was *wholly unwarranted* that good faith is absent.'" *United States v. McKneely,* 6 F.3d at 1454 (quoting *United States v. Cardall,* 773 F.2d at 1133). " 'The government, not the defendant, bears the burden of proving that its agents' reliance upon the warrant was objectively reasonable.'" *United States v. Cook,* 854 F.2d 371, 373 (10th Cir.1988) (quoting *United States v. Michaelian,* 803 F.2d 1042, 1048 (9th Cir.1986)), *cert. denied,* 488 U.S. 1006, 109 S.Ct. 788, 102 L.Ed.2d 779 (1989).

 The good faith exception is not without bounds. It does not immunize an officers' reliance if the officer knew or should have known the search warrant was invalid. *United States v. McKneely,* 6 F.3d at 1455. Thus, when the magistrate in finding probable cause is misled by information in the affidavit that the affiant knows to be false or would have known to be false except for his own reckless disregard, suppression of evidence remains an appropriate remedy. *United States v. Leon,* 468 U.S. at 923, 104 S.Ct. 3405. For the same reason, an officer does not "manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (quotation omitted).

 Both sides concur that the dispatcher erred in telling Detective Benavidez that the sender's address did not exist. Citing *United States v. Shareef,* 100 F.3d 1491, 1503 (10th Cir.1996), the defendants argue that such dispatcher errors can constitute a Fourth Amendment violation leading to the application of the exclusionary rule. The

defendants summarily argue the error was unreasonable and that the erroneous information must be excluded from the analysis. The defendant Wood also suggests that the dispatcher's error submits to analysis as an instance where the magistrate was misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.

The defendants have made no showing[6] that the dispatcher error here is one of deliberate or reckless falsity. Nor is this case where the court believes an extended analysis of the dispatcher's error is required.[7] There is nothing to suggest that the error here is the result of inadequate training, the lack of standardized procedures, or poor maintenance of computer records or that the error here is anything other than a simple human mistake. Under these circumstances, it should be enough that officer acted in a reasonable manner in not detecting the dispatcher's error and, thus, relying on the dispatcher's information. *See United States v. Walraven,* 892 F.2d 972, 975 (10th Cir.1989). The court finds that Detective Benavidez acted reasonably in not detecting the dispatcher's error and in relying on the information provided him. To require an officer to confirm the dispatcher's information by either driving by the address or looking up the information in the same or another directory is not reasonable under the circumstances where an officer is acting quickly to secure information for a search warrant application on a package in transit. Moreover, the court will not discount the officers' need to trust their dispatchers and to act promptly on the information relayed them. For these reasons, the court will not exclude the sender's fictitious address from its good faith analysis.

 '[P]olice officers should be entitled to rely upon the probable-cause determination of a neutral magistrate when defending an attack on their good faith for either seek-

---

6. Under *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the burden is with the defendant to demonstrate deliberate falsity or reckless disregard for the truth by the affiant, supported by an offer of proof. *United States v. $149,442.43 in U.S. Currency,* 965 F.2d 868, 874 (10th Cir.1992).

7. As there are no facts relevant to this matter before the court, any analysis would be sheer speculation.

ing or executing a warrant' particularly where, 'with the benefit of hindsight and thoughtful reflection, reviewing judges still cannot agree on the sufficiency of the affidavit.' " *United States v. McKneely,* 6 F.3d at 1454 (quoting *United States v. Corral–Corral,* 899 F.2d at 939). Where the supporting affidavit is more than a "bare bones" one and provides "evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause," an officer's reliance on the magistrate's finding of probable cause is objectively reasonable. *United States v. Leon,* 468 U.S. at 926, 104 S.Ct. 3405.

This case presents an extremely close call on whether the supporting affidavit is sufficient for an officer's reliance on it. It is true that in most instances a suspicious package is subjected to a canine sniff before a search warrant is obtained. *See, e.g., United States v. Scarborough,* 128 F.3d at 1378; *United States v. Daniel,* 982 F.2d at 150–52; *United States v. Lux,* 905 F.2d 1379, 1382 (10th Cir.1990). Still, "drug-detecting dogs have not supplanted the neutral and detached magistrate as the arbiter of probable cause." *United States v. Glover,* 104 F.3d 1570, 1577 (10th Cir.1997); *see United States v. Underwood,* 97 F.3d 1453, 1996 WL 536796, at *4 (6th Cir.1996) (Table) ("Although this omission [canine sniff] makes the question of probable cause much closer, we do not believe that it is fatal."), *cert. denied,* —— U.S. ——, 117 S.Ct. 787, 136 L.Ed.2d 729 (1997).

Though Detective Benavidez certainly could have addressed several other areas in his affidavit, the court does not consider his affidavit to be a "bare bones" affidavit that is totally devoid of factual support for his opinions. The officer related his experience with illegal drugs being shipped through delivery services located in Tempe, Arizona. The package here was being shipped from one individual to another. The affidavit, construed in a common sense, nontechnical manner, offers numerous facts from which one could reasonably conclude that the sender wanted to conceal his identity and connection to the package and wanted to make it difficult for someone to identify quickly the intended recipient of the package. The sender used a name that was not publicly listed in the area. The sender gave a phone number

that was used by a business which did know him. The sender used a zip code that was incorrect for the general location. The sender gave an address that did not exist. Finally, the sender paid almost $40 in cash to send the package. Based on eleven and one-half years of experience as a police officer with Tempe, Detective Benavidez opined "that suspects attempting to ship illegal drugs through delivery services often pay cash to avoid leaving a paper trail" and "also use fictitious addresses for themselves in the event that the package is discovered by law enforcement." Finally, the affidavit further reveals that the sender attempted to encumber efforts to identify the intended recipient by giving the addressee's name as only "Bones." Based on the combined weight of these averred facts and the officer's experience, the court finds that Detective Benavidez's reliance on the warrant was not wholly unwarranted but was objectively reasonable.

### C. EXECUTION OF WARRANT AT 2626 SE 45TH

The defendant Wood complains that the search warrant executed on his residence stated with particularity the following items to be seized:

> Items for the sale and/or use of methamphetamine as provided for by K.S.A. 65–4152;
>
> Items that would identify all persons residing at the premises including receipts and correspondence;
>
> Notations, addresses and/or phone numbers to area code 602 (Arizona)

The search warrant return totals five pages and lists over 90 items seized including firearms, ammunition, camera, and various computer equipment. The defendant estimates that nearly one-half of the seized items were not described or authorized by the warrant. The defendant argues the following rule is applicable here that " '[w]hen law enforcement officers grossly exceed the scope of a search warrant in *seizing* property, the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of *all evidence* seized under that warrant.' " *Unit-*

ed States v. Foster, 100 F.3d 846, 850 (10th Cir.1996) (quoting *United States v. Medlin,* 842 F.2d 1194, 1199 (10th Cir.1988)).

The Fourth Amendment requires that no warrants may issue except those "particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another." *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927). The Fourth Amendment also prohibits unreasonable searches and seizures which means that an officer must act reasonably in executing a search warrant. *United States v. Hargus,* 128 F.3d 1358, 1363 (10th Cir.1997), *petition for cert. filed,* ⸺ U.S.L.W.⸺ (U.S. Dec. 5, 1997) (No. 97–7024). "[A] search is not invalidated merely because some things are seized that are not stated in the warrant." *Id.* "If evidence is illegally seized, the general rule is that 'only the improperly seized evidence, not all of the evidence, must be suppressed, unless there was a flagrant disregard for the terms of the warrant.' " *Id.* (quoting *United States v. $149,442.43 in U.S. Currency,* 965 F.2d 868, 875 (10th Cir.1992) (internal quotations omitted)). On the other hand, when officers flagrantly disregard the terms of the warrant and seize items that grossly exceed the warrant's description, then the blanket suppression of all evidence seized is the appropriate remedy. *United States v. Foster,* 100 F.3d at 849–51.

The second warrant issued for 2626 S.E. 45th Street that listed firearms and computer equipment virtually eliminates any claim of a general search in this case. The court has little difficulty finding that the other items on the warrant return qualify as either items relevant for the sale and/or use of methamphetamine or items that identify persons residing at the premises. When the subject of the search concerns drug trafficking, the Tenth Circuit has upheld warrants that have only a general list of items to be seized. *United States v. Wicks,* 995 F.2d 964, 973–74 (10th Cir.), *cert. denied,* 510 U.S. 982, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993). "[A]llowing drug agents some latitude in this area 'simply recognizes the reality that few people keep documents of their criminal transactions in a folder marketed drug records.' " *United States v. Emmons,* 24 F.3d 1210, 1216 (10th Cir.1994). There are no facts to indicate that the officers flagrantly disregarded the two search warrants in seizing items from the residence at 2626 S.E. 45th Street.

D. *SEARCH WARRANT FOR FOOT LOCKER*

The defendant Wood argues the affidavit does not provide probable cause as there is no direct averment that contraband would be found in the foot locker. The court believes the affidavit provides ample detail from earlier searches of the defendant's residence and from comments made by witnesses to the defendant's drug trafficking business. These details provide a substantial basis for believing that the foot locker contained contraband.

The reviewing court gives "great deference" to the issuing judge's determination of probable cause, for it is a determination based on common sense. *United States v. Finnigin,* 113 F.3d 1182, 1185 (10th Cir. 1997). The issuing judge must make a practical, common-sense determination from the totality of the circumstances presented whether there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The issuing judge is expected to draw reasonable inferences from the affidavits. *See United States v. Edmonson,* 962 F.2d 1535, 1540 (10th Cir.1992). The reviewing court will uphold that determination if the supporting affidavits provide a substantial basis for finding that probable cause existed. *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Finnigin,* 113 F.3d at 1185. "In applying the test enunciated in *Gates,* this Court has stated that the 'affidavit should be considered in a common sense, nontechnical manner ...' " *Edmonson,* 962 F.2d at 1540 (quoting *United States v. Massey,* 687 F.2d 1348, 1355 (10th Cir.1982) (citation omitted)).

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates,* 462 U.S. at 232, 103 S.Ct. 2317. The Supreme Court has found it sufficient to say that probable cause is more than a mere suspicion, but considerably less than what is necessary to convict someone. *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *see United States v. Wicks,* 995 F.2d at 972 ("The existence of probable cause is a 'common-sense standard' requiring 'facts sufficient to warrant a man of reasonable caution in belief that an offense has been committed.'") (quoting *United States v. Mesa–Rincon,* 911 F.2d 1433, 1439 (10th Cir.1990)) (quoting *Brinegar v. United States,* 338 U.S. 160, 174, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)).

■ Probable cause to search a location does not depend on direct evidence or personal knowledge that evidence or contraband is located there. *United States v. Hargus,* 128 F.3d at 1362. The affidavit need not aver that criminal activity actually occurred there. *See United States v. $149,442.43 in U.S. Currency,* 965 F.2d at 874. It is enough when the affidavit establishes a "nexus between the objects to be seized and the place to be searched" from which "a person of reasonable caution" would "believe that the articles sought would be found" there. *United States v. Hargus,* 128 F.3d at 1362. This nexus "may be established through ... normal inferences as to where the articles sought would be located." *United States v. Freeman,* 685 F.2d 942, 949 (5th Cir.1982). "[C]ourts often rely on the opinion of police officers as to where contraband may be kept." *United States v. $149,442.43 in U.S. Currency,* 965 F.2d at 874 (citations omitted).

■ From the facts as revealed in the affidavit, officers knew that Randy Wood and Jerry Hammond were both involved in the shipping of methamphetamine and that Wood had used Hammond's name and Hammond's girlfriend's residence in the drug trafficking business. Hammond had told officers that the foot locker belonged to Wood. The locker was secured by two key locks, and Hammond and Kuhn consented to the officers taking the foot locker with them. Officers had found some packaging material in Wood's residence and a small amount of methamphetamine. From Wood's girlfriend, Melanie Griffin, officers learned that Griffin had been upset over the delivery of methamphetamine to their home and had told Wood the methamphetamine should not be shipped there. Considering Wood's other arrangements with Hammond, Wood's recent problems with Griffin for having methamphetamine at his home, Wood's ownership of the foot locker and his manner of securing and storing it, and the limited drug trafficking paraphernalia found at Wood's house, there was a substantial basis for the issuing judge to believe that the foot locker contained evidence or contraband connected to Wood's drug trafficking.

### E. HAMMOND'S STATEMENTS

The defendant Hammond moves to suppress the statement he made at 2021 S.E. Washington and the subsequent videotaped statement he made at the police station. Hammond argues that the officers never administered the Miranda warning before subjecting him to a custodial interrogation at the residence. As for his videotaped interview, Hammond argues it was a mere continuation of his first statement and that there were no intervening events after the first statement as to justify a finding that Hammond's videotaped statement was voluntarily given.

The government cannot use a defendant's statements stemming from custodial interrogation unless it proves the prior use of procedural safeguards. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The requirement of a Miranda warning is triggered by custodial interrogation, that is, "the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" *United States v. Perdue,* 8 F.3d 1455, 1463 (10th Cir.1993). As soon as the suspect "has been deprived of his freedom of action in any significant way," *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602, or has his freedom limited to a "degree associated with formal arrest," *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), the suspect is considered to be in "custody." *United States v. Perdue,* 8 F.3d at 1463. Consequently, a

defendant upon arrest must be advised of his rights before law enforcement officers began interrogation.

For purposes of *Miranda*, interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). It is said that "*Miranda* applies only if an individual is subject to 'either express questioning or its functional equivalent.'" *United States v. Davis*, 40 F.3d 1069, 1078 (10th Cir.1994) (quoting *Rhode Island v. Innis*, 446 U.S. at 300–01, 100 S.Ct. 1682), *cert. denied*, 514 U.S. 1088, 115 S.Ct. 1806, 131 L.Ed.2d 732 (1995). "Volunteered statements of any kind are not barred by the Fifth Amendment." *Miranda*, 384 U.S. at 478, 86 S.Ct. 1602. Thus, absent a showing of coercion or other misconduct by law enforcement, an arrestee's volunteered statements made before receiving the Miranda warning may be used against him. *Rhode Island v. Innis*, 446 U.S. at 300–02, 100 S.Ct. 1682.

A suspect who has been informed of his Miranda rights "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. The burden rests with the government to prove a valid waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168–69, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *United States v. Amos*, 984 F.2d 1067, 1074 (10th Cir.1993). A court may find a proper waiver "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).[8] Once the defendant validly waives his Miranda rights, interrogation may continue until the defendant invokes his rights or changed circumstances suggest the responses have become involuntary. *United States v. Abreu*, 730 F.Supp. 1018, 1030 (D.Colo.1990), *aff'd*, 935 F.2d 1130 (10th Cir.), *cert. denied*, 502 U.S. 897, 112 S.Ct. 271, 116 L.Ed.2d 224 (1991).

Even when a defendant's *Miranda* rights are not violated, the court must still conduct a Fifth Amendment inquiry into the voluntariness of any statements. *United States v. Roman–Zarate*, 115 F.3d 778, 783 (10th Cir.1997). The court looks to the totality of the circumstances in determining whether the statements were voluntary. *United States v. Glover*, 104 F.3d at 1579. Specific factors relevant in this determination include: the age, education, and intelligence of the defendant; the length of detention and questioning; whether Miranda warnings were given; the defendant's physical and mental characteristics; and the location of the questioning. *United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir.1987), *cert. denied*, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988); *see United States v. Short*, 947 F.2d 1445, 1449 (10th Cir.1991), *cert. denied*, 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992). "In no case, however, is any single factor determinative." *Chalan*, 812 F.2d at 1307.

In deciding if the waiver was intelligent, the court looks at whether "the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him." *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir.1990) (citation omitted), *cert. denied*, 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991). The defendant need not appreciate "the tactical advantage of remaining silent" for the waiver to be intelligent. *Id.* The Supreme Court has "never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.'" *Connecticut v. Barrett*, 479 U.S. 523, 530, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987) (quoting

8. A court must satisfy itself of two things before finding a valid waiver of Miranda rights:

"First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.

Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

*Oregon v. Elstad,* 470 U.S. 298, 316, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)).

■ The evidence is somewhat unclear as to the order of events that transpired after officers arrived at 2021 S.E. Washington. The court is satisfied that officers Bohlender and Hill approached the house that day in a typical investigatory fashion without their weapons drawn. There is no real dispute that Hammond permitted the officers to enter the residence or that the officers asked several questions to confirm their suspicions about Hammond's connection to the package, including his nicknames. Up to this point, a reasonable person in Hammond's position would not have believed that his freedom of action had been curtailed to a degree associated with a formal arrest. While the officers did not tell Hammond that he could refrain from answering their questions, they also did not engage in prolonged accusatory questioning. *United States v. Griffin,* 7 F.3d 1512, 1518 (10th Cir.1993). This entire encounter occurred in a residence where Hammond apparently was staying with Kuhn. The circumstances do not resemble a police-dominated atmosphere. Only Bohlender and Hill came to the door and Hill asked the initial questions while Bohlender conducted a brief protective sweep. The officers did not threaten Hammond or separate him from Kuhn. Officers did not display their weapons and did not have physical contact with Hammond. Nothing in the officer's language, tone of voice or actions implied that the officer might compel Hammond's compliance with their questions. From these circumstances, the court finds that a reasonable person in Hammond's position would not have believed himself to be in custody until officer Hill announced that he was under arrest.

■ Officer Hill testified that the *Miranda* warning was not given when the defendant was told he was under arrest. Even so, the court heard no specific testimony that Officer Hill interrogated Hammond between the time that he announced the arrest and the time that he gave the *Miranda* warning. Officer Hill did ask Hammond if he wanted to be interviewed at the station, and Hammond said he would after putting on some clothes. Nor did the officers engage in conduct that was the functional equivalent of interrogation. The act of accompanying the defendant to another room while he put on his shoes is not the equivalent of interrogation. It was while putting on his shoes that Hammond asked officer Hill if the officers had the methamphetamine. The court finds from the weight of the evidence that Hammond volunteered this statement; that it was not the result of any interrogation, and that *Miranda* does not require the suppression of this statement.

■ The court believes Officer Hill's testimony that he read Hammond the *Miranda* warning after hearing Hammond's question. It is credible that Officer Hill would arrest the defendant and then delay giving the *Miranda* warning until the actual interview at the station. The court does not find Kuhn's testimony credible to the extent that she believed she could hear from the living room or her bedroom every word spoken in her house and was quite adamant about hearing everything that Officer Hill told or asked Hammond, even when they were in a different room. On the videotape of Hammond's statement at the station, Officer Hill starts the interview by saying that he was going to read Hammond his *Miranda* rights "again." According to Officer Hill, the defendant indicated that he understood his rights and never indicated that he wanted an attorney or that he wanted to exercise his right to remain silent. There is no evidence of any threats or coercion by the officers, of any denial of any request from the defendant, or of any request to end the questions. The court finds that the government has shown that Hammond made a knowing, voluntary and intelligent waiver of his rights and that his statements subsequently made were voluntary under the Fifth Amendment.

Finally, the court has viewed the videotaped statement that Hammond made at the police station. Officer Hill administered the *Miranda* warning and waited for Hammond to indicate that he was willing to waive his rights and speak with Hill. For a couple of minutes, Hammond sat mute and gave no indication that he wanted to talk. Hill explained that the interview would be over if Hammond did not give his consent or said he did not want to answer any questions. When Hammond continued to say nothing, Officer

Hill then mentioned some of the areas that he intended to cover if there was an interview. At that point, Hammond said that he had "basically" told Hill everything about those matters. Officer Hill explained that he "needed" to cover some of these areas again in this setting and began to ask Hammond several questions. Hammond readily answered the questions, did not ask for an attorney, and did not indicate an intent to exercise his right to remain silent. The court is satisfied that Hammond waived his *Miranda* rights and voluntarily made the videotaped statement at the police station.

IT IS THEREFORE ORDERED that the defendant Wood's Motion for Disclosure of 404(b) Evidence (Dk.32) and the defendant Hammond's Request for Notice Pursuant to Rule 404(b) (Dk.39) are denied as moot;

IT IS FURTHER ORDERED that the defendant Wood's Motion to Join the co-defendant's motions (Dk.33) and the defendant Hammond's Motion to Adopt and Join in Pretrial Motions of co-defendant (Dk.35) are granted subject to the express conditions found in the court's *Criminal Procedural Guidelines,* ¶ I.C;

IT IS FURTHER ORDERED that the defendant Wood's Motion to Dismiss Count II (Dk.37) is denied on the condition that the government produce a bill of particulars on Count II within five days of this order;

IT IS FURTHER ORDERED that the defendant Wood's Motion to Suppress Evidence (Dk.31) and the defendant Hammond's Motion to Suppress Evidence (Dk.36) and Motion to Suppress Defendant's Statements (Dk.38) are denied.